ORIGINAL

SEALED
BY ORDER OF THE COURT

**LAW OFFICE OF CARL M. VARADY**
Carl M. Varady (HI Bar No. 4873)
Pauahi Tower
1003 Bishop Street, Suite 1730
Honolulu, Hawai'i 96813
Telephone: 808-523-8447
carl@varadylaw.com

CC: DKW, Filon.

**FILED IN THE
UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII**

**JUL 1 1 2022**

at 11 o'clock and 32 min. A M
CLERK, U.S. DISTRICT COURT

LS

**TYCKO & ZAVAREEI LLP**
Renée Brooker (admitted *pro hac vice*)
Eva Gunasekera (admitted *pro hac vice*)
1828 L Street NW, Suite 1000
Washington, DC 20036
Telephone: (202) 417-3664
Fax: (202) 973-0950
reneebrooker@tzlegal.com, eva@tzlegal.com
*Attorneys for Plaintiff*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF HAWAI'I

| | | |
|---|---|---|
| UNITED STATES OF AMERICA ex rel. SHANNON BENCS | ) ) ) | |
| Plaintiff-Relator | ) ) | |
| v. | ) ) | **Civil Action No. 22-cv-00036-DKW-WRP** |
| POND & COMPANY, POND CONSTRUCTORS, INC., APTIM CORP., APTIM FEDERAL SERVICES, LLC, AECOM, AECOM TECHNICAL SERVICES INC., HENSEL PHELPS CONSTRUCTION CO., and MEDIA PLUMBING & HEATING SERVICES, INC. d/b/a KINETIX | ) ) ) ) ) ) ) ) ) ) | **FILED IN CAMERA AND UNDER SEAL** **Jury Trial Requested** |
| Defendants | | |

## FIRST AMENDED COMPLAINT

**Table of Contents**

I.    STATEMENT OF THE CASE ........................................................................4

II.   LEGAL FRAMEWORK ...............................................................................8

   A.   Parties ....................................................................................................9

   B.   Jurisdiction and Venue.......................................................................14

   C.   Time Period.........................................................................................14

   D.   The False Claims Act .........................................................................14

III.  THE BACKGROUND .................................................................................16

   A.   Red Hill Fuel Facility .........................................................................16

   B.   Regulatory Requirements...................................................................20

   C.   The Military Contracts .......................................................................31

      1.   Pond.............................................................................................32

      2.   Aptim..........................................................................................44

      3.   AECOM.......................................................................................45

      4.   Hensel Phelps ............................................................................49

      5.   Kinetix ........................................................................................57

IV.   THE FRAUD SCHEME ..............................................................................60

   A.   Contractor Failures Led to Disastrous Fuel Leaks ...........................63

      1.   Failure to Maintain the Defuel Pipeline...................................66

      2.   Failure to Maintain the Fire Suppression System ...................70

      3.   Failure to Mitigate....................................................................72

   B.   Red Hill Is a Ticking Time Bomb Because of Contractor Failures............81

      1.   Failure to Remove the Bad Foam from the Fire Suppression System.....82

      2.   Failure to Install and Maintain Critical Components in the Fire
      Suppression System ........................................................................97

      3.   Failure to Install and Maintain Critical Components Throughout the Red
      Hill Fuel Facility .........................................................................101

V.    MATERIALITY ........................................................................................106

VI.   COUNTS ..................................................................................................115

VII.  APPENDIX................................................................................................121

A.  Red Hill Fuel Facility ...............................................................121
B.  Underground Tunnels and Pipelines..........................................122
C.  Underground Storage Tanks ....................................................125
D.  Fire Suppression System.........................................................129
E.  Pier to Fuel Ships ...................................................................135
F.  Improper PVC Piping...............................................................137

This is a False Claims Act *qui tam* action by Relator on behalf of the United States to recover treble damages and civil penalties arising from the actions of Pond & Company and its affiliate Pond Constructors, Inc. (collectively "Pond"), Aptim Corp. and its affiliate Aptim Federal Services, LLC (collectively "Aptim"), AECOM and its affiliate AECOM Technical Services Inc. (collectively "AECOM"), Hensel Phelps Construction Co. ("Hensel Phelps"), and Media Plumbing & Heating Services, Inc. d/b/a Kinetix ("Kinetix"). Collectively they are referred to as the "Contractors" or "Defendants." The United States is also referred to as "the Government" or "the Military."

## I.    STATEMENT OF THE CASE

1.    This False Claims Act *qui tam* case is brought to remedy the significant failures of Government Contractors to comply with conditions of their Contracts—worth at least $398 million— and environmental laws, and to protect the health and safety of the U.S. Military bases located at Pearl Harbor, including one million Military and Civilian families in the Pearl Harbor area. Because of the critical role of these bases to protect the United States in the Pacific, there are also larger national security implications to the Contractor failures alleged in this Complaint.

2.    Joint Base Pearl Harbor-Hickam combines the Hickam Air Force Base and the Pearl Harbor Naval Station on the island of Oʻahu, Hawaiʻi. The Red

4

Hill Bulk Fuel Storage Facility stores much of the fuel necessary to operate

everything at the Joint Base, including Military planes and ships. Red Hill is an

intricate system of underground fuel storage tanks, distribution pipelines, and

related equipment designed to meet the operational needs of the U.S. Military in

the Pacific on a massive scale. It was built during World War II, and to protect it

during an attack by outside forces, the Red Hill Fuel Facility was redesigned to be

entirely underground.

3.    The underground Facility is vast with 29 miles of underground fuel

pipelines (**the length of more than 832 Aloha Towers**), 7 miles of underground

tunnels, and 20 fuel storage tanks—**each one large enough to contain a 20-story

building**. Naturally, to protect the facility from catastrophic fuel fires, the Red

Hill Fuel Facility required a Fire Suppression System.

4.    The U.S. Military has funded Contractors to keep this important

infrastructure well-functioning and to protect against environmental, health and

fire hazards that could be catastrophic at the Red Hill Fuel Facility. Recognizing

that it needed to outsource responsibilities to those with the expertise and

resources, the United States has paid the Contractors hundreds of millions of

dollars to protect the Facility and the surrounding environment.

5.    However, the Contractors abused their positions of trust and failed to

ensure the safe and continued operation of the Joint Base. In doing so, they

5

violated their Contracts, EPA and Hawai'i health and environmental laws, and

numerous U.S. Military requirements.

6.     Specifically, the Contractors failed to properly maintain the Defuel

Pipeline, leading to a series of damaging and unmitigated fuel leaks—a domino

effect—culminating in the catastrophic fuel leak of November 2021, which

contaminated the drinking water of Civilian and Military families who were

drinking part water, part fuel, from their own kitchen and bathroom taps.

7.     Further and potentially more catastrophic, the Contractors bungled the

rebuild of the Fire Suppression System from the beginning and completely ignored

routine maintenance and repairs of the System. The Contractors' failures left the

entire Red Hill Fuel Facility and the larger Joint Base a ticking time bomb because

many of these failures rendered the Fire Suppression System either completely

inoperable or functioning only by manual operation.

8.     In further disregard of environmental laws and the health of Civilian

and Military families, the Contractors knowingly allowed a known health hazard—

outdated and outlawed chemicals—to remain in the Fire Suppressant Foam, which

then ran through pipes and leaked into groundwater at times causing the Fire

Suppression System to shut down.

9.     The Contractors failed at the most basic level to install and maintain

the proper components and equipment—such as installing synthetic plastic pipes

6

instead of steel pipes to run alongside fire-hot fuel pipes—throughout the Red Hill

Fuel Facility. These failures were themselves contributing factors to the fuel leaks,

including the disastrous November 2021 fuel leak that invaded people's homes.

10.    These failures were foreseeable and preventable.

11.    Nevertheless, the Contractors falsely certified compliance with

federal, state (Hawaiʻi) and contractual requirements, including EPA and U.S.

Military requirements, in their receipt of hundreds of millions of dollars in Military

Contracts.

12.    Through their fraudulent course of conduct, the Contractors

knowingly submitted or caused to be submitted false or fraudulent claims for

payment under the Military Contracts, in violation of the False Claims Act, and the

Military paid those claims.

13.    Because these Contractor failures were collective and compounding,

they are jointly and severally liable under the federal False Claims Act.

14.    But for Relator, the Military would not be on notice of the facts

alleged in this Complaint.

15.    The False Claims Act is the appropriate tool to remedy this fraudulent

scheme according to the Deputy Assistant Attorney General for the United States

Department of Justice: "the False Claims Act serves as the government's primary

civil tool to redress false claims for federal funds and property involving a

multitude of other **government operations and functions**. **The act helps to support our military** and first responders **by ensuring that government contractors provide equipment that is safe, effective, and cost efficient**." (emphasis added), https://www.justice.gov/opa/pr/justice-department-recovers-over-22-billion-false-claims-act-cases-fiscal-year-2020

16. False Claims Act cases where the U.S. Military was "sold a bill of goods" demonstrate that the U.S. Department of Justice will hold military contractors accountable: "The knowing failure to comply with contractual obligations [by falsely certifying that helicopters were 'fully mission capable" when they were not] is unacceptable, particularly when such violations raise safety concerns...reaffirm[ing] that the government will hold contractors to the quality and safety standards in their contracts that are intended to protect our men and women in uniform." (These cases are discussed under the Materiality Section of this Complaint). https://www.justice.gov/opa/pr/aar-corp-agrees-pay-11-million-settle-false-claims-act-allegations-aircraft-maintenance (2021)

17. The U.S. Department of Justice, similarly, will hold these Contractors accountable under the False Claims Act for "selling a bill of goods" to the U.S. Military—in the form of false promises to make good on their Contracts to protect, rebuild, maintain and evaluate the Red Hill Fuel Facility and its surrounding area.

## II.    LEGAL FRAMEWORK

8

**A. Parties**

18.   Relator alleges, based upon personal knowledge, relevant documents and information, and on information and belief, the facts set forth in this Complaint.

19.   Relator has extensive first-hand knowledge of Defendants' pattern and practice alleged in the Complaint.

20.   Relator has standing to bring this action pursuant to 31 U.S.C. § 3730(b)(l). Relator is entitled to either between 15-25 percent of the proceeds that result from this action, or any settlement of the claims raised or identified in this complaint, under 31 U.S.C. § 3730(d)(1); or between 25-30 percent of the proceeds pursuant to 31 U.S.C. § 3730(d)(2) and Haw. Rev. Stat. § 661-27 (award to qui tam plaintiffs)

21.   Pursuant to subsection (e)(4)(A) of 31 U.S.C. § 3730, Relator voluntarily disclosed to the Government the information on which the allegations or transactions in the claims are based; and Relator has knowledge that is independent of and materially adds to any publicly disclosed allegations or transactions that may exist and has voluntarily provided the information to the Government before filing an action under this section. 31 U.S.C. § 3730(e)(4)(A). Relator is the original source of these allegations as defined in 31 U.S.C. § 3730(e)(4)(B). Haw. Rev. Stat. § 661-27 (award to qui tam plaintiffs)

9

22.    Relator has complied with all procedural requirements of the laws under which this Complaint is brought.

23.    Defendant Pond & Company ("Pond & Co.") is a Georgia corporation with its principal place of business at 3500 Parkway Lane, Suite 500, Peachtree Corners, GA 30092, and maintains an office in this District at 4429 Malaai Street, Suite 104, Honolulu, Hawai'i 96818.

24.    Pond & Co. provides construction and industrial services (i.e., planning, engineering, construction management, and general contracting), including to the U.S. Military. Pond & Co. received over $194 million in federal contract awards since at least 2001 for services rendered to the U.S. Department of Defense, among other federal agencies. And it provides "full-service planning, architecture, engineering, construction and construction management solutions to the U.S. Navy and Marine Corps," currently on more than 55 contracts.

25.    Pond & Co. is a parent corporation to Defendant Pond Constructors, Inc.

26.    Defendant Pond Constructors, Inc., an affiliate of Defendant Pond & Co., is a Georgia corporation with its principal place of business at 3500 Parkway Lane, Suite 500, Peachtree Corners, GA 30092. Pond Constructors, Inc. has received over $378 million in federal contracts since 2001, almost entirely from the U.S. Department of Defense. Pond Constructors, Inc. received a federal contract

10

for more than $200 million to provide oil and gas operations at U.S. Military

petroleum facilities, under which Pond Constructors, Inc. contracted to perform

maintenance and repair work at the Pearl Harbor-Red Hill Fuel Facility, as alleged

in this Complaint.

27.    Both Defendants Pond & Co. and Pond Constructors, Inc. are

collectively referred to in this Complaint as "Pond."

28.    Defendant Aptim Corp. is a Delaware corporation with its principal

place of business at 4171 Essen Lane, Baton Rouge, LA 70809. Aptim Corp.

provides engineering, program management, environmental services, disaster

recovery, complex facility maintenance, and construction services, including to the

U.S. Military.

29.    Aptim Corp. is the parent corporation to Defendant Aptim Federal

Services, LLC.

30.    Defendant Aptim Federal Services, LLC, an Affiliate of Defendant

Aptim Corp., is a Louisiana limited liability company with its principal place of

business at 4171 Essen Lane, Baton Rouge, LA 70809.

31.    Aptim Federal Services, LLC received over $2.7 billion in federal

contract awards since at least 2002 for services rendered to the U.S. Department of

Defense, among other federal agencies. It contracts with U.S. military bases across

the world and has received federal contracts totaling at least $139.8 million to

11

inspect and repair the Pearl Harbor-Red Hill Fuel Facility, as alleged in this
Complaint.

32.    Aptim Corp. and Aptim Federal Services, LLC are collectively
referred to in this Complaint as "Aptim."

33.    Defendant AECOM is a Texas corporation with its principal place of
business at 13355 Noel Road, Number 400, Dallas, TX 75240. According to its
website, AECOM provides infrastructure and support services, including
environmental services to address complex environmental challenges. AECOM is
one of Fortune 500's largest companies in America and ranked first in Engineering
News-Record's 2020 "Top 200 Environmental Firms." In fiscal year 2020, its
Professional Services business had a revenue of $13.3 billion. AECOM is the
parent corporation to Defendant AECOM Technical Services Inc.

34.    Defendant AECOM Technical Services Inc., an Affiliate of Defendant
AECOM, is a California corporation with its principal place of business at 300
South Grande Avenue, Number 900, Los Angeles, CA 90071. AECOM Technical
Services Inc. has received over $3.8 billion in federal contract awards and federal
grants since 2001, including federal contract awards to perform "Red Hill Fuel
Facility Groundwater Flow Model", Red Hill Fuel Facility Conceptual Site
Models," and investigation and remediation of releases at the Pearl Harbor-Red
Hill Fuel Facility, as alleged in this Complaint.

35.     Both Defendants AECOM and AECOM Technical Services Inc. are collectively referred to in this Complaint as "AECOM."

36.     Defendant Hensel Phelps Construction Co. ("Hensel Phelps") is a Colorado corporation with its principal place of business at 420 Sixth Avenue, Greeley, CO 80631, and an office in this district at 841 Bishop Street, Suite 2001, Honolulu, HI 96813. Hensel Phelps is one of the largest general contractors in the construction business in the United States. It was ranked second for top Government contractors by Building Design+Construction, and its portfolio of government and public projects, including work for the U.S. Military, is worth $12 billion. Hensel Phelps has received nearly $1.1 billion in federal contract awards, nearly entirely from the U.S. Department of Defense, and including a contract to perform work at the Pearl Harbor-Red Hill Fuel Facility, as alleged in this Complaint.

37.     Defendant Media Plumbing & Heating Service, Inc., d/b/a Kinetix ("Kinetix") is a Pennsylvania corporation with its principal place of business at 12 Creek Parkway, Boothwyn, PA 19061. Kinetix received over $113 million in federal contract awards since at least 2003 for services rendered for the U.S. Department of Defense, U.S. General Services Administration, U.S. Department of Veterans Affairs, among other government agencies, including for maintenance and repair work on the Fire Suppression System at the Pearl Harbor-Red Hill Fuel

13

Facility, as alleged in this Complaint. On its website, it refers to itself as "fire and life safety experts."

## B. Jurisdiction and Venue

38.     This Court has subject matter jurisdiction over the claims asserted in this Complaint, pursuant to the False Claims Act, 31 U.S.C. §§ 3729 *et seq.*, and 28 U.S.C. § 1331.

39.     Venue is proper in this judicial district, pursuant to 31 U.S.C. § 3732(a), because Defendants may be found, reside, and/or transact or have transacted business in this District, or because an act, proscribed by 31 U.S.C. § 3729, occurred in this District.

## C. Time Period

40.     On information and belief, Defendants' fraudulent conduct alleged in this Complaint began at least as early as 2015.

## D. The False Claims Act

41.     The False Claims Act imposes liability on any person who:

(A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval

(B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim

14

(C) conspires to commit a violation of subparagraph (A), (B), [ ] or (G), [ ]

(G) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government, [ ]. 31 U.S.C. § 3729(a)(1)(A), (B), (C), (G)

42.    Such a person is liable to the United States Government for a mandatory civil penalty, plus three times the amount of damages which the Government sustains because of the person's act(s). Currently, the mandatory civil penalties range from $11,803 to $23,607 for each violation occurring after November 2, 2015. 31 U.S.C. § 3729(a)(1), as adjusted by 28 U.S.C. 2461 note, Pub. L. 101-410; 86 Fed. Reg. 70740 (Dec. 13, 2021) (establishing penalties for False Claims Act violations assessed after December 13, 2021, for violations occurring after November 2, 2015).

43.    Under the False Claims Act, knowledge is demonstrated when the person has actual knowledge of the information, acts in deliberate ignorance of the information's truth or falsity, or acts in reckless disregard of its truth or falsity. The person need not have the specific intent to defraud. 31 U.S.C. § 3729(b)(1)-(2).

15

44.    A claim is any request or demand for money or property that is

presented to an officer, agent, or employee of the Government. A claim can also be

a request or demand that is made to a contractor, grantee, or other recipient, as long

as the money or property would be spent on the Government's behalf or to advance

a Government program or interest, and the Government either provides or will

reimburse the recipient for any portion of the money or property requested. 31

U.S.C. § 3729(b)(1)-(2).

45.    Under the False Claims Act, materiality is defined as "having a

natural tendency to influence, or be capable of influencing, the payment or receipt

of money or property."  31 U.S.C. § 3729(b)(4)

## III.   THE BACKGROUND

### A. Red Hill Fuel Facility

46.    Joint Base Pearl Harbor-Hickam (the "Joint Base" or "Pearl Harbor-

Hickman"), which is located on the island of O'ahu, Hawai'i ("O'ahu"), combines

the Hickam Air Force Base and the Pearl Harbor Naval Station. A few miles from

the Pearl Harbor Naval Station is the Red Hill Bulk Fuel Storage Facility ("Pearl

Harbor-Red Hill Fuel Facility" or "Red Hill Fuel Facility" or the "Fuel Facility" or

the "Facility"), which stores much of the fuel necessary to operate everything at

the Joint Base, including the planes and ships.

16

47.     The Red Hill Fuel Facility is an intricate system of underground

storage tanks, pipelines, and related equipment that meets the operational needs of

the U.S. Military in the Pacific on a massive scale.

48.     The Red Hill Fuel Facility is also significant to our national security,

which traces to its inception during WW II.  The attack on Pearl Harbor was one of

the most devastating in American history because the United States had no unified

command or defenses, leading to the deaths and wounding of thousands of U.S.

Military men and women and civilians and the destruction of nearly 300 American

warplanes and 20 ships.  The attack also nearly hit Pearl Harbor's then-

aboveground fuel tanks, which contained the U.S. Navy's entire fuel supply for its

Pacific Fleet.  "[T]he sudden lack of fuel would have crippled the fleet."

49.     Recognizing the vulnerability to Pearl Harbor's then-aboveground

fuel storage system, the Red Hill Fuel Facility was constructed underground.

Construction started during World War II and the Facility began operation in 1943.

The Facility is massive with:

- **7 geographic sections** called ADITS: ADIT 1 (on the **western**
  most side of the Facility), ADIT 2, ADIT 3, ADIT 4, ADIT 5,
  ADIT 6 and Red Hill (on the **eastern** most side of the Facility)
  - ADIT 1 and Red Hill are referred to as the **"Book Ends"**
    in this Complaint (image at Appendix)

17

- **29 miles** of underground pipelines (the length of **more than 832 Aloha Towers**) (image at Appendix)

- **7 miles** of underground tunnels (the length of **more than 200 Aloha Towers**) (image at Appendix)

- **20 Fuel Storage Tanks** located **underground** ("Underground Fuel Storage Tanks") (image at Appendix)

  o The Fuel Tanks store almost **250 million gallons** of diesel and jet fuels for U.S. Military, U.S. Coast Guard, and other Government ships and planes

  o The Fuel Tanks are 110 feet to 175 feet **underground** (the Aloha Tower is 184 feet tall) to protect them from bombing

  o The Fuel Tanks are 100 feet **above the aquifer** that supplies 77 percent of drinking water for Oʻahu and its nearly 1 million residents (the "Oʻahu Aquifer")

  o The Fuel Tanks are roughly **250 feet tall** and **100 feet wide**—each one large enough to contain a **20-story building**

- A Fire Suppression System (image at Appendix)

18

- o **Fire Suppressant Foam Tanks** at both ends of the

  Facility (the "Book Ends")

    - ▪ "Red Hill" Suppressant Foam Tanks protect the

      Red Hill Storage Facility

    - ▪ "ADIT 1 Suppressant Foam Tanks protect the

      Underground Pump House and Upper Tank Farm

- o ventilation systems (image at Appendix)

- o a control room

- o surge tanks

- o slop oil and oil recovery facilities

- • A pier to fuel ships (image at Appendix)

    - o The Joint Base houses at least **10 Naval ships**

    - o The Joint Base houses at least **15 Naval submarines**

50.    But while the underground location of the Red Hill Fuel Facility

provides protection from **external** attacks, this U.S. Military asset faces **internal**

threats to the integrity of the Facility caused by pervasive and ongoing failures of

the Contractors. The thousands of individual components that make up this

massive Facility must each function properly to ensure that the U.S. Military can

continue to safely access the fuel they need, provide safe drinking water to the one

million or so residents, and prevent widespread or catastrophic fire.

19

## B. Regulatory Requirements

51.    Defendants certified to the Military that their construction,

maintenance, and evaluation work at the Red Hill Fuel Facility complied with

federal, state (Hawai'i), and Military requirements, including (a) U.S. and Hawai'i

environmental regulations codified in 40 C.F.R. Part 280 and Haw. Code R. § 11-

280.1, which address technical standards, maintenance, and corrective action

requirements for Underground Storage Tanks; (b) U.S. EPA environmental

regulations codified in 40 C.F.R. Part 112, which establish procedures, methods,

and requirements to prevent the discharge of petroleum and fuel oil into navigable

waters; (c) Occupational Safety and Health Administration standards codified in 29

C.F.R. Part 1910, which set health and safety requirements for the workplace—

including where a contractor exposes its employees to workplace hazards; (d)

Military standards, including U.S. Department of Defense Unified Facilities

Criteria (UFC) governing the design and maintenance of petroleum fuel facilities

and fire protection systems, and (e) National Fire Protection Association standards

governing the proper maintenance and operation of fire protection systems. "Fire

Protection System" and "Fire Suppression System" means the same thing in this

Complaint.

52.    In Hawai'i, the Underground Storage Tank Program is subject to

overlapping and comprehensive federal and state regulatory schemes. Pursuant to

20

40 C.F.R. Parts 281 and 282, EPA "approved" Hawaiʻi's Underground Storage

Tank Program in 2002. A state with an approved Underground Storage Tank

Program —and in this case, specifically the Hawaiʻi Department of Health—"will

have primary enforcement responsibility with respect to the requirements of the

approved program," but "EPA retains authority to take enforcement action as

necessary." 40 C.F.R. § 282.61; 40 C.F.R. § 281.11(c).

53.    As part of the approval process, EPA and the approved state must

negotiate a Memorandum of Agreement containing "proposed areas of

coordination and shared responsibilities between the state (Hawaiʻi) and EPA," as

well as separate roles and responsibilities. The Hawaiʻi Department of Health and

EPA first entered into a Memorandum of Agreement in September 2002. This

Agreement, which remains in effect until EPA approves Hawaiʻi's revised

Underground Storage Tank Program, grants EPA an "oversight role with respect to

the State's program" and "envisions that EPA and the State will

coordinate . . . regarding targeting of joint efforts to prevent and mitigate

environmental problems associated with the improper management of USTs

[underground storage tanks]." Hawaiʻi: Final Approval of State Underground

Storage Tank Program, 67 Fed. Reg. 60161, 60164 (Sept. 25, 2002). 40 C.F.R. §

281.23.

54.     EPA sets the baseline for Underground Storage Tank Program
regulations, and any state with an approved Underground Storage Tank Program
must enact regulations that are "no less stringent than the corresponding federal
requirement." 40 C.F.R. § 281.11(b).

55.     In 2015, EPA revised the Underground Storage Tank Program
regulations for the first time since they were promulgated in 1988. These revisions
"further strengthen protection of human health and the environment from UST
[underground storage tank] releases by increasing the emphasis on proper
operation and maintenance of release prevention and release detection equipment."
Revising Underground Storage Tank Regulations—Revisions to Existing
Requirements and New Requirements for Secondary Containment and Operator
Training, 80 Fed. Reg. 41566, 41569 (July 15, 2015), codified at 40 C.F.R. pts.
280 and 281.

56.     In response to EPA's revisions, in 2018 Hawaiʻi repealed its previous
Underground Storage Tank Program regulations and promulgated revised
regulations, under the authority of Haw. Rev. Stat. 342L-3, to be no less stringent
than the federal requirement. These revised regulations became effective on July
15, 2018. Haw. Code R. § 11-280.1.

57.     Underground Storage Tank Program regulations apply to fuel storage
systems in which any one or a combination of tanks, including attached

22

underground pipes, is used to contain an accumulation of regulated substances, the

volume of which is ten percent or more underground. If these conditions are met,

subject to partial exclusions, the Underground Storage Tank Program regulations

apply to the underground and aboveground tanks, connected underground piping,

underground ancillary equipment such as piping, fittings, flanges, valves, and

pumps, and containment systems. Haw. Code R. §§ 11-280.1-12, 11-280.1-

10(C)(2)(B).

58.    Under the overlapping regulatory schemes, an Underground Storage

Tank Program system that fails to function properly must be restored to its proper

operating condition to prevent releases due to the system's structural failure or

corrosion. 40 C.F.R. § 280.33(a); Haw. Code R. §§ 11-280.1-33(a), 11-280.1-12.

59.    To that end, an Underground Storage Tank Program system's

corrosion protection system must be periodically checked. Additionally, the

revised regulations established intervals at which an Underground Storage Tank

Program system's overfill prevention equipment, spill prevention equipment, and

leak detection system must be inspected. 40 C.F.R. §§ 280.31, 280.35-36; Haw.

Code R. §§ 11-280.1-31, 35-36.

60.    Owners and operators of an Underground Storage Tank Program

system must maintain records of these repairs to, and inspections of, the

Underground Storage Tank Program system. 40 C.F.R. §§ 280.33(g), 280.34(b);
Haw. Code R. §§ 1-280.1-33(b), 280.1-34(b).

61. And owners and operators of an Underground Storage Tank Program
system must take certain steps following a release, including reporting the release
to the Hawai'i Department of Health within twenty-four hours and, within seven
days, following up with information about the estimated quantity of substance
released, immediate hazards, release impact, and migration pathways. Haw. Code
R. § 11-280.1-61.

62. After a release, an assessment must measure for the presence of a
release. Sampling types, locations, and methods must be determined by
considering the nature of the stored substance and the depth and flow of
groundwater, among other factors necessary to identify the presence and source of
the release. 40 C.F.R. § 280.62(a)(5); Haw Code R. § 11-280.1-62(a)(5).

63. The Contracts at issue in this matter also incorporate EPA
environmental regulations codified in 40 C.F.R. Part 112 (Oil Pollution
Prevention), which establish procedures, methods, equipment, and other
requirements to prevent the discharge of oil—including petroleum and fuel oil—
into navigable waters. 40 C.F.R. Part 112 is authorized by the Clean Water Act, 33
U.S.C. 1251 *et seq.*, and applies to any onshore storage facility of oil or oil
products which could reasonably be expected to discharge harmful quantities of oil

24

into navigable waters. Although the Oil Pollution Prevention regulation exempts

any underground storage tanks and equipment that are subject to the Underground

Storage Tank Program regulations, it regulates other equipment and response

protocols at a storage facility. 40 C.F.R. §§ 112.1(b), (d)(4); 40 C.F.R. § 112.2.

64.    Under the Oil Pollution Prevention regulation, all aboveground

valves, piping, and appurtenances must be regularly inspected, including an

assessment of the general condition of flange and expansion joints, pipeline

supports, and valves. Buried piping must also undergo integrity and leak testing at

the time of installation, construction, and any time it is modified, relocated, or

replaced. 40 C.F.R. §112.8(d)(4).

65.    Further, the owner or operator of a regulated facility must submit a

facility response plan that identifies an emergency response action plan and

potential hazards from a discharge, including the potential effects of a discharge on

the environment. 40 C.F.R. § 112.20(h)(1), (4).

66.    The Contracts at issue in this matter also incorporate a set of military

standards known as Unified Facilities Criteria ("UFC"), which provide facility

planning, design, construction, operation and maintenance, sustainment,

restoration, and modernization criteria for facilities owned by the [Department of

Defense]." MIL-STD-3007G § 1.2.

25

67.    DOD Directive 4270.5 requires that UFCs "shall be used to the greatest extent possible by all the DoD components for planning, design, and construction (restoration and modernization) of facilities . . ."

68.    Defendants also certified compliance with National Fire Protection Association (NFPA) Standards, which set various requirements for fire protection systems and are often incorporated into federal, state, and Military standards, including the Hawaiʻi state fire code.

69.    These Military and fire protection standards require periodic inspections and preventive maintenance of fuel facilities and the systems contained therein—such inspections and maintenance are necessary "to avoid system shutdowns, prevent fuel contamination, and decrease fire, safety, and health hazards. Periodic inspections and maintenance are **essential** to continue efficient safe operations and reduce major repairs." UFC 3-460-03 (2021) § 1-1.1 (emphasis added).

70.    UFC 3-460-03 concerns the maintenance of petroleum systems used for jet engine, automotive, and diesel fuel storage facilities, among others, and establishes "required frequency intervals" for recurring maintenance programs. It also "[p]rovides checklists for the inspection and maintenance" of such facilities, along with "fuel quality, safety, environmental, [and] fire protection guidance to

26

follow during the inspection and maintenance of Petroleum Fuel Systems." UFC 3-460-03 (2021) at 4, § 1-1.2, App'x C; UFC 3-460-03 (2003) §§ 1.1, 1.1.2, 10.1

71.     Under this Military standard, the following petroleum system components must be maintained at certain frequencies:

- Hot pit hydrant control valves and emergency shut-off valves on a quarterly basis. UFC 3-460-03 (2003) §§ 10.3.24.5.4, 10.3.24.5.5 & Table 10.1.

- Gate valves on a quarterly basis. UFC 3-460-03 (2003) § 10.3.8.2; UFC 3-460-03 (2021) § 6-6.2.3, App'x C.

- Corrosion protection for exposed piping on a semi-annual. UFC 3-460-03 (2003) § 10.3.6.3.1 & Table 10.1.

- Pressure relief valves and thermal relief valves on an annual basis. UFC 3-460-03 (2003) § 10.3.14; UFC 3-460-03 (2021) § 6-6.3, App'x C.

72.     Additionally, pipelines must be tested for leaks on an annual basis and undergo pressure testing on an annual basis. Aboveground and underground pipes must also be visually inspected. UFC 3-460-03 (2003) §§ 2.3.1, 2.3.2, 2.3.3, 2.3.3.1; UFC 3-460-03 (2021) § 6-1.3, App'x C, App'x G.

73.     UFC 3-600-01 sets certain requirements for the engineering of fire protection systems, including materials required to be used in system components.

27

These requirements "reflect the need for the protection of life, mission continuity, and property (building or contents) while taking into account the costs of implementing the criterion and risks associated with the Facility." UFC 3-600-01 (2021) § 1-1

74.     This Military standard requires that piping for foam solution "must be Schedule 40 steel pipe," and foam concentrate piping must be stainless steel pipe. PVC and Chlorinated PVC ("CPVC") are not permitted in foam systems used in petroleum facilities. UFC 3-600-01 (2013) § 4-4.1.1; UFC 3-600-01 (2021) §§ 9-9.2.1, 9.2.2.

75.     These Aqueous Film-Forming Foam (AFFF) systems must also be paired with storage and containment systems that protect against seepage into the environment after a discharge. UFC 3-600-01 (2013) § 4-4.6; UFC 3-600-01 (2021) § 9-9.3.2.

76.     Additionally, AFFF systems must only use AFFF concentrate that meets Military Specification MIL-F-24385F. UFC 3-600-01 (2013) § 4-4.2; UFC 3-600-01 (2021) § 9-9.3.3.

77.     Under National Fire Protection Association Standard 11, the installing contractor must also test the completed foam system to determine that the system functions as intended. The installing contractor must test each operating device and

28

equipment for function, including a complete check of electrical control circuits and supervisory systems. NFPA 11 (2021) §§ 12.3.1-2, 12.5.1, 12.5.3, 12.7.

78.    Further, all foam system piping must undergo hydrostatic pressure testing upon installation. NFPA Standard 13 sets the requirements to conduct this hydrostatic testing by subjecting the piping to an increased internal pressure for a specified period of time, in order to verify the system integrity and leak rates. NFPA 11 (2021) §§ 12.4.1, 12.7, 12.9.2.1; NFPA 13 (2022) §§ 29.2.1.1, 3.3.111.

79.    After installation, Military standard UFC 3-601-02 establishes inspection, testing, and maintenance requirements for the various components within a fire protection system. UFC 3-601-02 (2010) Tables 2-8 & 2-9; UFC 3-601 (2021) Table 2-18.

80.    These inspection, testing, and maintenance tasks must be performed by crafts persons trained or qualified in the maintenance and repair of the specific fire protection system or subsystem. UFC 3-601-02 (2010) § 1-8.1.

81.    For example, in fire protection systems using AFFF:

- Certain control valves must be inspected monthly, while others must be inspected annually. UFC 3-601-02 (2010) Table 2-9; UFC 3-601-02 (2021) Table 2-18.

29

- Foam concentrate and foam proportioning systems must be verified and/or inspected semi-annually. UFC 3-601-02 (2010) Table 2-9; UFC 3-601-02 (2021) Table 2-18.

- Foam concentrate must be tested annually. UFC 3-601-02 (2010) Table 2-9; UFC 3-601-02 (2021) Table 2-18.

- Control valves must be operated through its entire travel to verify function every two years. UFC 3-601-02 (2010) Table 2-9; UFC 3-601-02 (2021) Table 2-18.

82.     The fire detection and alarm system components, including initiating devices, digital alarm transmitters, and heat detectors, must also be inspected, tested, and maintained at certain intervals:

- Digital alarm transmitters and receivers must be tested annually. UFC 3-601-02 (2010) Table 2-1; UFC 3-601-02 (2021) Table 2-1.

- Heat detectors must be tested every two years. UFC 3-601-02 (2010) Table 2-1; UFC 3-601-02 (2021) Table 2-1.

83.     Further, National Fire Code Protection Association (NFPA) Standard 11 requires that fire protection systems using foam are routinely inspected, tested, and maintained, including through annual operational tests and examinations of aboveground piping. NFPA 11 (2021) §§ 13.1.1.1, 13.2.1.1-2, 13.2.3.1, & Table 13.1.1.2.

30

84.    The mandatory inspection and maintenance frequencies in the

Military and fire protection standards require that deficiencies in petroleum fuel

systems and fire protection systems are promptly reported and corrected.

**C. The Military Contracts**

85.    The Defendant Contractors are parties to Contracts worth at least $398

million awarded by the Military for the upgrade, maintenance, and evaluation of

the Pearl Harbor-Red Hill Fuel Facility (collectively referred to as "the

Contracts"). The Facility is critical to the mission of the U.S. Military in the Pacific

and there is no alternative Facility to replace this one.  The Contracts were

intended to address water and fire safety issues and prevent catastrophic

consequences that could result from poor maintenance at a massive fuel storage

facility: fires and devastating fuel leaks into the environment, including the Oʻahu

Aquifer, which serves as the source of drinking water for one million individuals.

These overlapping and comprehensive contractual obligations ensure the Red Hill

Fuel Facility continues to meet U.S. Military needs.

31

| Contractor | Contract Requirements (for Red Hill, Pearl Harbor, and K-Bay fuel facilities) | Contract Numbers | Contract Awards |
|---|---|---|---|
| Pond | Recurring maintenance and repair of fuel facilities and components | Modification 14 to Basic Ordering Agreement W912DY13G0004 | $40M |
| Aptim | Inspection and repair of tanks and pipelines | Contract No. N3943015D1632, Task Order Nos. 004, 005, N3943018F4132, N3943019F4021<br><br>Contract No. N3943020D2225, Task Order Nos. N6247821F4271, N3943021F4182, N6247820F4295, N3943021F4207<br><br>Contract No. N6258309D0130, Task Order No. 0040 | $139.8M |
| AECOM | Investigation and remediation of fuel releases, groundwater evaluation and protection, and environmental risk evaluation | Contract No. N6274217D1800, Task Order Nos. N6274218F0126, N6274218F0176<br><br>Contract No. N6274212D1829, Task Order Nos. 0053, 0063 | Up to $160.8M |
| Hensel Phelps | Upgrade and maintenance of fire suppression and ventilation systems and components | Contract No. N6274215C1308 | $51M |
| Kinetix | Maintenance and repair of fire suppression systems and components | Contract No. N6247818D2466 | $6.5M |

## 1. Pond

86.    The Military relies extensively on Pond's maintenance and repair work to ensure Military facilities across the globe are safe, operable, and can access the fuel they need to continue important Military objectives.

87.    On February 4, 2013, Pond entered into a Basic Ordering Agreement with Defense Logistics Agency Energy to support oil and gas operations at Military petroleum facilities.

88.    Although a Basic Ordering Agreement is not itself a contract and does not have funding attached, it is an "instrument of understanding" that contains key terms and clauses that will apply to future contracts; descriptions of the anticipated services to be provided under those contracts; and methods for pricing, issuing, and delivering future orders. The Basic Ordering Agreement was a condition precedent

32

and mandatory for Pond to enter into subsequent agreements for specific work at specific Military facilities. 48 C.F.R. § 217.7401; 48 C.F.R. § 16.703.

89.     After the Basic Ordering Agreement was in place, Pond was able to enter into several subsequent contracts: Pond and Defense Logistics Agency Energy entered into 15 modifications to the Basic Ordering Agreement through May 12, 2017. These modifications provided more than $200 million in funding and specified more defined services for Pond to perform.

90.     On April 14, 2017, Pond and Defense Logistics Agency Energy agreed to Modification 14 ("Mod 14" or "the Contract"), pursuant to which Pond agreed to maintain and repair at least 25 fuel facilities, including the Red Hill Fuel Facility, Defense Fuel Support Point Pearl Harbor ("Pearl Harbor"), Hickam Air Force Base ("Hickam"), U.S. Marine Corps Base Kaneohe Bay ("K-Bay") in Hawai'i, Camp Hansen and U.S. Marine Corps Air Station Futenma ("MCAS Futenma") in Okinawa, and other bases in Hawai'i, Japan, and the Indian Ocean. This is the 2017 Recurring Maintenance and Minor Repairs Services Program ("RMMR").

91.     On information and belief, most payments under the Contract were made for RMMR at the Red Hill Fuel Facility, Pearl Harbor, and K-Bay.

33

92.     As of the date of this Complaint, the Military has paid Pond at least

$40 million under the Contract and Pond is eligible for further extensions for

millions more.

93.     Pond's contractual obligations are clear: (1) perform initial

inspections, identify necessary repairs, and, as a result, inventory fuel-related

equipment and components to ensure proper and safe operations; and (2) conduct

routine inspection visits—quarterly, semi-annually, and annually—of the facilities

to continually identify and perform necessary RMMR on an ongoing basis.

94.     These contractual obligations were co-dependent. Pond's obligation to

maintain an updated inventory of fuel-related equipment (Step One) formed the

basis of a Facility Maintenance Plan, which then defined which components would

be maintained at each routine inspection visit (Step Two). The results of those

inspection visits, in turn, would identify which equipment at the facilities required

service, repair, or replacement.

95.     Any deficiency or break in any of these contractual obligations

could—and, as described below, did—cause equipment failures that could—and

did—deprive the Military of what it bargained for. Step Two (the proper and safe

operation of Military fuel facilities by servicing, repairing, and replacing deficient

fuel-related equipment) was **only** guaranteed if Step One (the equipment inventory

resulting in the Facility Maintenance Plan) was updated, complete, and accurate.

34

96.    In other words, Pond and the Military could only know which fuel-related equipment needed to be repaired or replaced if Pond inventoried, inspected and knew the status of each of the components comprising these complex fuel storage systems and maintained documentation evidencing its routine maintenance and upkeep.

97.    On information and belief, since 2013, Pond has been providing and continues to provide the same or substantially similar services to petroleum facilities operated by several branches of the Military across the globe.

98.    The Contract requires that Pond perform RMMR to meet the requirements established in federal and state environmental and safety regulations. Pond must also perform RMMR in accordance with Military standards outlined in the Unified Facilities Criteria ("UFC"), except where conflicting—and often more stringent—terms in the Contract govern.

99.    The Contract provides for a multi-layered payment arrangement, based on the services performed, type of visit, and facility: Pond receives a fixed payment for each instance of quarterly, semi-annual, or annual maintenance at each facility, with prices varying by type of visit and facility, and Pond receives additional payments for each minor repair, based on a price negotiated with the Military.

35

100.   Maintenance includes "re-current, periodic or scheduled work to

preserve a facility by preventing its deterioration," including by:

- Ensuring pressure gauges are properly set

- Ensuring bolts are tight and not corroded

- Ensuring that valves are not leaking

- Ensuring that valves, pumps, and pipes in the Fire Suppression

  System are operating properly

101.   Under the Contract, all RMMR activities must be completed in the

month they are scheduled. No deviations from this requirement are permitted:

| Table 2. Assessment Items | | | |
|---|---|---|---|
| Requirement | Standard | Government Inspection Goal | Allowable Deviation |
| Recurring Maintenance Completion | 100% of the recurring maintenance activities will be completed in the month they are scheduled | 10% onsite QA of RM activities | No deviation is allowed |

102.   In light of the serious environmental, safety, and national security

interests at stake, Pond was also required to "immediately" report to the Military

any "[s]ystem impairments and deficiencies" identified in its inspection and

maintenance of the fire protection systems.

103.   Minor repair, meanwhile, involves restoring a facility's components to

"such a condition that it may effectively be utilized for its designated purpose." For

example, minor repair includes replacing a defective valve, meter, gasket, or filter

element.

36

104.    All the routine and emergency repairs must be completed within the

timeframes specified in the Contract: 30 days after Military approval for routine

repairs and 72 hours after Military approval for emergency repairs, unless the lead

time for materials, logistical difficulties, or work complexity require an extension.

If an extension is necessary, the repair is designated as "long lead time."

| | acceptable | | |
| --- | --- | --- | --- |
| **Emergency Repairs Completion** | 100% of the emergency repairs will be completed within the timeframe specified by the PWS. | 10% review of completed service orders during QA visit. QA performed as a "back-check". | No deviation is allowed for completeness or workmanship. Timeframe deviation is allowed for instances where lead time for materials, logistical difficulties, or work complexity extend the time needed to complete the repair. |
| **Routine Repairs Completion** | 100% of the routine repairs will be completed within the timeframe specified by the PWS. | 10% review of completed service orders during QA visit. QA performed as a "back-check". | No deviation is allowed for completeness or workmanship. Timeframe deviation is allowed for instances where lead time for materials, logistical difficulties, or work complexity extend the time needed to complete the repair. |

105.    "Minor repairs" are anything but minor. Each minor repair had a

threshold between $150,000 to $250,000 over time, and the Military estimated that

minor repair services would total $5.5 million annually, with a 3% increase each

year.

106.    Based in large part on Pond's routine inspections and pursuant to the

Contract, the Military creates a service order for Pond to conduct each minor

37

repair. The Military's service order initiates a process resulting in Pond completing

the repair as specified:

- The Military generates a service order requesting the repair

- Pond determines the personnel, equipment, tools, materials, and
  other items necessary to complete the repair

- Pond develops a work plan and proposed price to submit to the
  Military

- The Military and Pond negotiate the scope and cost of services

- The Military approves the negotiated cost and scope

- The approved agreement becomes a firm-fixed price agreement

- Pond must complete the service order itself or by delegating to
  subcontractors within the time frame specified in the agreement

107.   The Performance Work Statement in the Contract defined Pond's

obligations at the Military fuel facilities:

- Perform an initial site visit.

- Prepare an accurate inventory of all fuel-related equipment and
  components.

- Provide this updated inventory of fuel-related equipment to the
  Military.

38

- Prepare and implement a task order work plan before all tasks and activities required under the Contract.

- Create, maintain, and update maintenance records for each facility.

- Prepare a Facility Maintenance Plan based on the initial site visit and inventories, describing the work to be performed during Pond's subsequent maintenance visits.

- Conduct routine maintenance and inspection visits based on the Facility Maintenance Plan.

- Inspect specific components and fuel-related equipment on a quarterly, semi-annual, or annual basis, pursuant to the Contract.

- Inspect, test, and ensure proper operation of the Fire Suppression System and its related Fire Suppressant Foam tanks and pipes on a quarterly and semi-annual basis, pursuant to the Contact.

- Provide documentation to the Military demonstrating its quarterly, semi-annual, and annual inspection visits.

- Identify deteriorating equipment during these routine visits.

- Maintain deteriorating equipment or, if minor repair is needed, schedule the repair, obtain a service order from the Military, and perform the needed repairs for additional payment.

108. Although Appendix H of the Contract contained an initial equipment list for each of the facilities, this list was incomplete: Appendix H expressly warned that the list "may not be accurate." Accordingly, Pond was required to update each equipment inventory following initial site visits to ensure that each inventory is complete and includes all significant components for the safe operation of the facilities.

109. Pond was also required to perform quarterly- and semi-annual maintenance of valves associated with hot pit refueling systems. Mod 14 PWS expressly defined the five types of valves that Pond was required to maintain quarterly and the valve to be maintained semi-annually:

### 3.2.17.5 Type IV Hot Pit Refueling System

#### 3.2.17.5.1 Defuel / Flush Valve (58AF-9-1)

Check pressure relief, check-valve function, solenoid operation, and opening and closing speed controls. The typical pressure relief set point is 100 psig. Set the opening and closing speed control as fast as possible while still maintaining smooth operation.

#### 3.2.17.5.2 Pantograph Pressure Control Valve (PPCV) (58E-47)

Check pressure control, opening and closing rates, and solenoid operation. The typical set point is 75 psig. The typical opening and closing speed is 3 seconds.

#### 3.2.17.5.3 Hydrant Control Valve (362AF-7)

Check pressure-reducing control, pressure-relief control, opening speed, and deadman operation. The typical setting for pressure-reducing control is 45 psig. The pressure-relief control must close within 5 seconds when system pressure reaches 50 psig. The typical opening speed is 20 seconds; however, to dampen the nozzle pressure wave, opening speed may be retarded. When the deadman is released, the deadman must close the valve within 5 seconds. NOTE: This valve is connected to the pantograph system and is hydraulically operated.

#### 3.2.17.5.4 Emergency Shut-Off Valve (136SAF-9B)

Check solenoid operation, DP control, and quick-closing feature. Verify valve closes within 10 seconds. Solenoids are energized except during power failures or when the ESO switch is activated. The typical setting for the differential control is approximately 7 psig.

#### 3.2.17.5.5 Flush Valve (136AF-5A)

Check solenoid operation and quick-closing feature. Solenoid is de-energized when the system is placed in pantograph flush.

### 3.3.6.4 Type IV Hot Pit Refueling System

#### 3.3.6.4.1 High Level Shut-Off Valve (129AF-3A)

When the tank is being filled, check for proper operation of the high-level control valve. This valve uses a fail-safe closed pilot system. This means that if the control line ruptures, the main valve will close. CAUTION: When testing, use the minimum flow necessary.

110. Further, Pond was required to maintain and annually test pressure and

thermal relief valves at Pearl Harbor-Defense Fuel Support Point, crucial

components of a fuel system:

---

**3.4.12 Pressure Relief Valves**

Check system pressure relief valves to ensure proper operation. Test and/or adjust the pressure
relief valve 10% above system deadhead pressure, not to exceed 275 psig. Repeat the test, if
applicable, a minimum of three times to ensure proper operation. Not all pressure relief valves
are set at 10% above the maximum operating pressure. Thermal relief valves must be set to
allow cascading of pressure back to the storage tank. In this case use set points specified in
construction documentation.

---

111. Because even minor temperature changes can cause substantial

increases in pressure, the UFC cautions that "it is absolutely essential that all

closed systems have a pressure relief bypass system (thermal release by-pass valve

and or check valve)."

112. The UFC specifies monthly, quarterly, and annual maintenance to be

performed on these valves:

42

| 6-6.3.1 | Inspection and Maintenance – Thermal and Pressure Relief Valves. |
|---|---|
| a. | Thermal and pressure relief valves must be inspected for signs of leak-by. Inspect relief valves for leaks by visually inspecting downstream flow indicators (if installed) for flow. If no flow indicators are installed listen for possible leaks. If suspect: isolate and test the relief valve; check opening pressure; and verify re-seating. Malfunctioning valves must be repaired or replaced.<br>**Frequency: Monthly** |
| b. | Ensure manual isolation valves installed upstream and downstream of thermal and pressure relief valves are open with valve handles removed, wired open or locked.<br>**Frequency: Monthly** |
| c. | Inspect exterior of thermal and pressure relief valves for corrosion. Repaint as required. Information plates attached to thermal and pressure relief valves must not be painted over.<br>**Frequency: Quarterly** |
| d. | Verify thermal and pressure relief valve setting by consulting as-built and historical data.<br>**Frequency: Annually** |
| e. | Thermal and pressure relief valves must be validated for proper calibration by isolating the valve and using the test connection provided on the piping in conjunction with a hand pump and portable reservoir. The operating pressure must be checked against the set pressure listed on the stamped information plate attached to the valve. The operating pressure must be adjusted to the stamped set pressure if necessary. \1\ If there is no test connection provided, isolate the relief valve and remove the valve to test. If there is no valve isolation or test connection, consider adding these to simplify future testing. ⌷<br>**Frequency: Annually** |

113.  Pond's recurring maintenance and minor repair work, which relies

upon an updated inventory and compliance with federal, state, and Military

standards, is the essence of what the Military bargained for. The Contract expressly

identifies the purpose of this recurring work "to ensure their [the fuel systems']

availability to receive, store, distribute and dispense fuel."

43

114.    Pond's compliance with the terms of the Contract and with the
incorporated federal, state (Hawai'i), and Military standards is thus essential to
national security, safety, and environmental protection.

## 2. Aptim

115.    Aptim worked alongside Pond to inspect and repair the Pearl Harbor-
Red Hill Fuel Facility.

116.    Aptim had joint and overlapping responsibility with Pond—to the
tune of at least \$139.8 million—to ensure the proper and safe operation of the Pearl
Harbor-Red Hill Fuel Facility. Aptim contracted to inspect and repair the Pearl
Harbor-Red Hill Fuel Facility from as early as 2014 to at least 2021.

117.    Aptim's several Contracts at the Pearl Harbor-Red Hill Fuel Facility
required it to:

- Clean, inspect, maintain, and repair Fuel Tanks and surge tanks

- Assess and repair underground and external pipelines

- Rework the fire sprinkler piping associated with Fuel Tanks 4
  and 13

- Ensure the fire detection system was in operable condition in
  compliance with 29 C.F.R. § 1910.164(c)(1)-(2)

- Ensure compliance with federal and state (Hawai'i)
  environmental regulations and Military standards

44

118. Aptim's compliance with the terms of its Contracts and with the
incorporated federal, state (Hawaiʻi), and Military standards is equally essential to
national security, safety, and environmental protection.

**3. AECOM**

119. AECOM provides environmental technical services and
environmental consulting to U.S. Navy commands throughout the Pacific,
including at the Pearl Harbor-Red Hill Fuel Facility. Given the Red Hill Fuel
Facility's proximity to sources of drinking water and the Facility's potential to
cause catastrophic environmental harm, AECOM's services are crucial.

120. AECOM has been awarded multiple federal indefinite delivery
contracts from the U.S. Department of Defense to provide Comprehensive Long-
term Environmental Action for the Navy ("CLEAN Contracts"), under which
AECOM receives contract awards to provide more defined environmental services
for Naval Facilities Engineering Systems Command in the Pacific.

121. In March 2004, AECOM was awarded the CLEAN III indefinite
delivery contract, under which it has been awarded 115 federal contract awards
with a combined potential value of $76.2 million. In September 2012, AECOM
was awarded the CLEAN IV indefinite delivery contract, under which it has been
awarded 110 federal contracts with a combined potential value of $98.3 million.
And most recently, in August 2017, AECOM was awarded the CLEAN V

45

indefinite delivery contract. To date, under the CLEAN V Contract, AECOM has received at least 110 federal contract awards totaling almost $170.5 million.

122.   In light of recent fuel leaks, which caused "unanticipated urgent and compelling requirements" at the Pearl Harbor-Red Hill Fuel Facility and "an ongoing emergency regarding petroleum contamination in the drinking water," the contract ceiling for the CLEAN V Contract was recently increased by $97 million—raising the contract ceiling to a total of $337 million.

123.   AECOM is the only contractor on this CLEAN V Contract and will gain directly from this multimillion-dollar increase.

124.   AECOM's contractual obligations at the Pearl Harbor-Red Hill Fuel Facility, as specified in more defined contract awards, stem from both the CLEAN IV and CLEAN V Contracts.

125.   For example, under the CLEAN IV Contract, AECOM received task order numbers 0053 and 0063 to investigate and evaluate the environmental risk at the Pearl Harbor-Red Hill Fuel Facility, for at least $15 million.

126.   In March 2018, under the CLEAN V Contract, AECOM also received an award to investigate and remediate fuel releases, groundwater protection and evaluation at the Pearl Harbor-Red Hill Fuel Facility. In September 2021, a few months after a fuel leak in May 2021, the Contract award was increased by $12.7 million. To date, this Contract totals $46 million, with the potential to increase

substantially in light of the recent increase to the CLEAN V contract ceiling and several years remaining until its completion.

127. This specific task order, number N6274218F0126, "includes environmental technical services for addressing an Administrative Order of Consent (AOC), Sections 6 and 7," which was entered into by the Hawai'i Department of Health, the U.S. EPA, the Navy, and Defense Logistics Agency in 2015, after a fuel release from one of Red Hill's Fuel Tanks the preceding year. The Complaint refers to this as the "CLEAN V Contract, Consent Order."

128. The purpose of the Administrative Order on Consent is to "regulate underground storage tanks ("USTs") and waste and to protect drinking water, natural resources, human health, and the environment." Any work undertaken pursuant to the Administrative Order on Consent must be conducted in accordance with applicable EPA and DOH guidance, policies, and procedures.

129. AECOM contracted to ensure compliance with the Administrative Order on Consent related to the investigation and remediation of releases and groundwater protection and evaluation, including:

- An update to the existing Groundwater Protection Plan

- Groundwater protection and evaluation

- Groundwater well monitoring

47

130. The Administrative Order on Consent required that the Groundwater Protection Plan be updated "to include response procedures and trigger points in the event that contamination from the [Red Hill] Facility shows movement toward any drinking water well."

131. Additionally, AECOM's groundwater protection and evaluation are necessary to "monitor and characterize the flow of groundwater around the [Red Hill] Facility," including creating groundwater flow models which "improve understanding of the direction and rate of groundwater flow within the aquifers." The collective groundwater protection and monitoring work will be used to inform subsequent changes to the Groundwater Protection Plan.

132. These Red Hill Fuel Facility Groundwater Flow Analyses are simulations used to advance the Navy's, EPA's and the Hawai'i Department of Health's understandings of the aquifers around the Red Hill Fuel Facility.

133. Under its Contracts, AECOM prepared several additional reports and information about the environmental characteristics of the Red Hill Fuel Facility to provide to U.S. EPA, Hawai'i Department of Health, and the Navy.

134. AECOM's environmental analyses and technical expertise is necessary to ensure compliance with federal and state environmental regulations, such as establishing a release response plan and identifying environmental hazards.

48

135. AECOM also contracted to provide urgent evaluation and response to
the environmental hazards created by a fuel release, including evaluating
groundwater monitoring and soil vapor monitoring test results.

136. AECOM's subcontractor, GSI Environmental Inc., provides
engineering and environmental science consulting around the globe, including in
Hawaiʻi. GSI Environmental Inc. also performed some of these contractual
responsibilities under AECOM's direction and oversight, necessary for AECOM to
perform its Contracts.

137. AECOM's compliance with the terms of its Contracts and with the
regulatory requirements contained in the Contracts are essential to protect the
environment from devastating leaks and to mitigate the harm resulting from these
leaks.

**4. Hensel Phelps**

138. Hensel Phelps contracted to install, test, and maintain one aspect of
the Pearl Harbor-Red Hill Fuel Facility that is essential in a facility containing
flammable liquids: its Fire Suppression System.

139. In 2015, Hensel Phelps was awarded a \$42.8 million contract to
upgrade to the Fire Suppression System, including the design, building,
maintenance, and quality assurance of the new system, and the ventilation system.

49

140.    There were 22 modifications to the initial Contract award, most of which were described as "upgrades to fire suppression and ventilation system." The Military obligated over $51 million for the award and modifications.

141.    The upgrade extended to the Book Ends and included everything in between, because the Fire Suppression System is a single electronic system that requires two-way communication to ensure protection of the entire Pearl Harbor-Red Hill Fuel Facility.

142.    As part of its Contracts, Hensel Phelps was expressly required to properly contain and dispose of any released Fire Suppressant Foam and return the Fire Suppression System to "fully operational status":

> Discharged solution shall be contained and disposed of in a manner that is acceptable to local authorities and as identified on the approved test plan. . . . system shall be returned to fully operational status, including filling of AFFF [Fire Suppressant Foam] concentrate tanks with concentrate and filling of solution piping with premix as required.

143.    Hensel Phelps and its subcontractors were required to:

- Demolish the existing fire alarm system

50

- Install wet pipe water fire sprinkler system in the Upper Tunnel and automatic AFFF (Fire Suppressant Foam) water fire suppression system in the Lower Tunnel at Fuel Tanks 1-20

- Provide a new 250,000 gallon water tank, two fire pumps, fire pump building, hydrants, and fire protection water supply lines

- Provide appropriate containment for the disposal of Fire Suppressant Foam

- Repair existing and provide additional oil tight doors and fire separations along the tunnel

- Provide new alarm system, including heat and thermal sensors

- Upgrade ventilation systems

144.    Under the Contracts, Hensel Phelps was also required to test all components of the rebuilt Fire Suppression System to ensure that everything was operable for this critical infrastructure that ensured the safe operation and maintenance of the Pearl Harbor-Red Hill Fuel Facility.

145.    The Hensel Phelps Contract required that:

Tests shall be conducted under the supervision of a technical representative employed by the AFFF concentrate manufacturer. **The complete AFFF concentrate system shall be adjusted and tested to**

**assure proper operation.** Test results, including all pressure settings and readings, shall be recorded on an appropriate test form signed and dated by manufacturer's representative certifying that the system is in compliance with contract requirements and the manufacturer's recommended practices.

Testing shall include, but not be limited to, the following:

a. **Filling the AFFF concentrate tank.**

b. Adjustment of pressure sustaining valves, pump relief valves, and proportioners.

c. Collection of AFFF samples and testing with a conductivity meter to verify proportioning accuracy.

d. **Testing AFFF concentrate pumps for proper automatic operation.**

This shall include start and stop settings, automatic shutoff, and relief valve operation.

e. Testing low liquid level alarms and pump shutoff.

f. Other operational checks recommended by the AFFF proportioner manufacturer.

52

(emphasis added)

146. The test requirements also included these:

Tests shall be conducted under the supervision of a factory-trained representative of the control panel manufacturer. The electrical control system shall be tested to verify that the control panel and all wiring have been installed correctly and that all components function as intended.

Tests shall be conducted using normal operating and battery power. Testing shall include, but not be limited to, each of the following:

a. Alarm initiating circuit and device. This shall include heat detectors, manual actuation stations, waterflow and pressure switches, and similar devices connected to the control panel.

147. Further, Hensel Phelps was required to communicate and promptly remediate any deficiencies noted from these tests.

148. The system will be considered ready for final testing only after the following have been accomplished.

a. The required test plan has been submitted and approved.

53

> b. Preliminary tests have been made and deficiencies
> determined to have been corrected to the satisfaction of the
> equipment manufacturer's technical representatives and
> the Contracting Officer.

149. Hensel Phelps was also required to perform hydrostatic testing of the underground and aboveground piping systems to ensure that there was no leakage of Fire Suppressant Foam: "Hydrostatic testing is universally known and accepted as a means of demonstrating the fitness of a pressurized component for service. After a test, a pipeline or pressure vessel can be expected to safely contain its intended operating pressure."

150. Hydrostatic tests use pressure in the System's pipes and components to evaluate the pump's integrity and detect any leaks or weaknesses.

151. The Contract required that "underground and aboveground piping systems, including AFFF [Fire Suppressant Foam] concentrate, shall be hydrostatically tested in accordance with NFPA 13 . . . . There shall be no visible leakage from the piping when the system is subjected to the hydrostatic test." Moreover, such testing specific to Fire Suppressant Foam pipes was expected to be routine.

152. The Contracts explicitly required the use of steel piping and related steel components throughout the system, rather than piping made of PVC

54

("polyvinyl chloride"), because steel piping can withstand higher temperatures
before burning (200+ degrees Celsius versus 60 degrees Celsius):

- "Steel piping shall be schedule 40 for sizes less than 8 inches, and
  Schedule 40 for sizes 8 inches and larger. . . . Pipe and fittings shall be
  metal."

- "Pipe shall be standard weight stainless steel conforming to ASTM
  A312/A312M, Grade TP 304L"

- "Piping shall be ASTM A53/A53M, Weight Class STD (Standard),
  Schedule 40, Type E or Type S, Grade A; black steel pipe."

- "Drain piping from the body housing shall be minimum 1 inch steel
  and shall be arranged to drain to the outside of the building.  Piping
  shall be galvanized both on the inside and on the outside surfaces."

- "Each sleeve shall be Schedule 40 galvanized steel, ductile iron or
  cast iron pipe . . . ."

- "Nuts and bolts shall be heat-treated steel conforming to ASTM A183
  and shall be cadmium plated or zinc electroplated."

153.  In the course of these contractual obligations, Hensel Phelps was
required to "[p]rovide and maintain, during the life of the contract, environmental
protection" and "[c]omply with Federal, State [Hawai'i], and local regulations
pertaining to the environment, including water, air, [and] solid waste."

55

154. Hensel Phelps awarded at least 30 subcontract awards for work, under its direction and oversight, necessary for Hensel Phelps' to perform its Contracts to upgrade the fire suppression and ventilation systems. These include BB Construction Management, Inc., Total Fire Systems, Inc., Critchfield Pacific Inc., S.S. Dannaway Associates, Coffman Engineers Inc., and Quality Assurance Engineering, Inc.

155. BB Construction Management, Inc. provides construction and renovation services in both the state and federal industry. BB Construction Management, Inc. received a $3.2 million sub-award to provide the required electrical and fire alarm materials and components, under Hensel Phelps' direction and oversight. This subcontract required, and Hensel Phelps was obligated to ensure, compliance with the terms of Hensel Phelps' Contract.

156. Additionally, Total Fire Systems, Inc. received an approximately $5.3 million sub-award to provide fire suppression work and materials, under Hensel Phelps' direction and oversight, necessary for Hensel Phelps to perform its Contracts.

157. And Critchfield Pacific Inc. received an approximately $2.9 million sub-award to provide mechanical and plumbing work, under Hensel Phelps' direction and oversight. Each of these subcontract awards required, and Hensel

56

Phelps was obligated to ensure, strict compliance with the terms of Hensel Phelps'

Contract.

158.    Hensel Phelps also awarded subcontract awards to subcontractors that

worked under its direction and oversight to ensure quality control of the Fire

Suppression System. On October 16, 2015, S.S. Dannaway Associates received a

$269,333 sub-award contract to ensure compliance with the terms of Hensel

Phelps' Contract.

159.    On December 8, 2015, Coffman Engineers Inc. received a $47,000

sub-award contract to provide additional quality control. Shortly thereafter, in May

2016, Coffman Engineers Inc. acquired S. S. Dannaway Associates.

160.    Additionally, on October 21, 2015, Quality Assurance Engineering,

Inc. received a $127,902 subcontract award to inspect and test the materials used in

the Fire Suppression System.

161.    Each of these subcontract awards required, and Hensel Phelps was

obligated to ensure, strict compliance with the terms of Hensel Phelps' Contract.

**5. Kinetix**

162.    Kinetix is a fire and safety expert, as described by its website, that

contracted to correct deficiencies in the Pearl Harbor-Red Hill Fire Suppression

System.

163.   "The fire protection system at Red Hill is absolutely critical to protect the Department of Defenses' largest fuel facility in the event of a fire."

164.   Thus, the Kinetix Contract was awarded in June 2018, at a cost of over $1.2 million, "to provide maintenance and repair on fire protection systems by means of a combination firm-fixed price (FFP) and indefinite delivery-indefinite quantity (IDIQ contract).

165.   Under its Contract, Kinetix was required to maintain and repair the following fire protection systems and components at Military facilities, including the Pearl Harbor-Red Hill Fuel Facility:

- Fire alarm and detection systems
- Fire Suppression Systems
- Fire pumps
- Foam Fire Suppression Systems

166.   Kinetix was obligated to maintain, inspect, and test fire protection systems and fire alarm systems in accordance with the Military standards in UFC 3-601-02 and fire protection standards.

167.   The Contract was modified on March 19, 2021, resulting in the Military obligating a total of over $6.5 million to Kinetix for maintenance and repair of the Fire Suppression System as of the date of the modification.

58

168.   The modification to the Kinetix Contract was necessary because "the Red Hill Fire Protection Systems [] experienced unexpected operational failure." This "operational failure" was the complete inability of the Fire Suppression System to use the Fire Suppressant Foam, resulting in the System using only water. Thus, the modification for the additional repairs was necessary to restore the fire protection systems to operable condition.

169.   This modification expressly provided that Kinetix would:

- Inspect fire protection system piping between Pump House Building 313 and ADIT 6

- Perform any repairs identified in those inspections

- Repair both fire pumps and the jockey pump controller located in the Upper Pump House in ADIT 6

- Flush and install the drain pipe at Red Hill Tunnel in ADIT 1

- Replace valves and activate the fire pump

- Other various repairs to the fire protection systems at the Red Hill Fuel Facility

170.   Kinetix was expressly required to flush the Fire Suppression System of the Bad Foam and refill it with Good Foam: "Remnants of solution is still present in a portion of the system piping in ADIT 1. Due to the highly corrosive

59

nature of the Foam, the system needs to be flushed to avoid corrosion in the system piping, fittings, and components."

171.   Kinetix's compliance with the terms of its Contract and the Military and fire protection standards incorporated in the Contract is essential to ensure the "critical" Fire Suppression System at the Red Hill Fuel Facility is fully operational and does not undermine the integrity of the Fuel Facility.

## IV.   THE FRAUD SCHEME

172.   The Pearl Harbor-Red Hill Fuel Facility plays an important role in both our nation's history since WW II and our future national security. It serves the needs of our U.S. Military and U.S. Coast Guard in the Pacific as the major operational thoroughfare for U.S. ships and planes. Because it warehouses nearly 250 million gallons of fuel—fuel which sits above the O'ahu Aquifer, which serves as the water supply for nearly 1 million residents, fire and water safety of the entire Facility and its surrounding area is paramount.

173.   To ensure the fire and water safety of the Red Hill Fuel Facility, the U.S. Military is heavily dependent upon Contractors with the expertise and resources to properly address the needs of the Facility. The Military delegated the work to rebuild and maintain the Facility, including the Fire Suppression System, to Contractors who were paid hundreds of millions of dollars to abide by its commitments under the Contracts.

174.  The Contractors, however, knowingly failed to meet their obligations

to the U.S. Military, in violation of their Contracts and federal and state (Hawai'i)

requirements.  Specifically, the Contractors failed to properly maintain the Defuel

Pipeline, leading to a series of damaging fuel leaks, and failed to mitigate those

leaks, which resulted in the most recent catastrophic leak.  Further, the Contractors

failed to properly rebuild or maintain the Fire Suppression System.  Those failures

included the failure to remove damaging Fire Suppressant Foam, use the proper

(and safe) steel piping or maintain critical components of the Red Hill Fuel

Facility—failures which were themselves contributing factors to the fuel leaks.

Moreover, these failures were foreseeable and preventable had the Contractors

been compliant.

| Inspection, Testing, and Maintenance ("ITM") and Materials Requirements | | | |
|---|---|---|---|
| Component | Relevant UFC | Contract Provision | Requirements Met? |
| Defuel Line | UFC 3-460-03 - Operation and Maintenance of Petroleum Systems | Section 3.2.1 (Exposed Piping) | NO |
| Hot Pit Refueling, Pressure, Thermal, and Gate Valves | UFC 3-460-03 - Operation and Maintenance of Petroleum Systems | Sections 3.2.17.5.3 (Hydrant Control Valve); 3.2.17.5.4 (Emergency Shut-Off Valve); 3.4.12 (Pressure Relief Valves); and 3.2.4.3 (Gate Valves) | NO |
| Fire Suppression System | UFC 3-600-01, 3-601-02 - Fire Protection Systems Engineering, Operation, and Maintenance for Facilities | Upgrade Fire Suppression and Ventilation Systems - Red Hill Fuel Facility | NO |
| AFFF ("Foam") Piping | UFC 3-600-01, UFC 3-601-02 - Fire Protection Systems Engineering, Operation, and Maintenance for Facilities | Sections 2.1.1 (Pipe and Fittings) (Aboveground Piping Systems in Standpipe Systems); 2.2.1 (Steel Pipe) (Aboveground Piping Components in Wet Pipe Sprinkler System); 2.5.1.1 (Pipe) (Aboveground Piping Components in Fire Pumps); and 2.7.1 (Pipe) (Aboveground Piping Systems for AFFF Fire Protection System) | NO |
| Fire Alarm System | UFC 3-601-02 - Operation and Maintenance: Inspection, Testing, and Maintenance of Fire Protection Systems | Sections 3.2.18 (Quarterly Fire Protection System Maintenance); 3.3.7 (Semi-Annual Fire Protection System Maintenance); and 3.4.19 (Annual Fire Protection System Maintenance) | NO |

175.    Through their fraudulent course of conduct, the Contractors knowingly submitted or caused to be submitted false or fraudulent claims for payment under the Military Contracts, in violation of the False Claims Act, and the Military paid those claims.

176.    Because the Contractors falsely certified compliance with federal (including EPA), state and contractual requirements, they are jointly and severally liable under the federal False Claims Act.

## A. Contractor Failures Led to Disastrous Fuel Leaks

177. The U.S. Military has been concerned about fuel releases or "leaks" from Fuel Tanks and pipelines at the Red Hill Fuel Facility to the Oʻahu Aquifer since at least 2013.

178. Fuel leaks pose and continue to pose an imminent threat to human lives, the surrounding environment and national security at the larger Joint Base Pearl Harbor-Hickam. Yet they were foreseeable and preventable, with fault lying squarely at the feet of the Contractors.

179. In January 2014, the U.S. Navy reported a release into the environment of approximately 27,000 gallons of fuel from Tank 5 ("**January 2014 Fuel Leak**"), which occurred during the filling of one of the tanks (Tank 5) between December 12, 2013, and January 6, 2014.

180. In March 2020, the Navy observed a fuel leak at an abandoned fuel line near a refueling pier connected to the Red Hill Fuel Facility called "Hotel Pier" (the "**2020 Hotel Pier Fuel Leak**"). Recovery efforts led to the deployment of a device to keep surface oil contained called a "Boom." By early April, the Boom seemed to contain further leaking, and the Navy concluded that only 8 gallons of fuel had been leaked over a 22-day period. However, a series of leaks were later detected including these:

- 1-2 quarts daily in June

63

- More leaks of lesser amounts through August 10

- another large leak on August 11

After excavation, testing and inspection of the fuel pipelines, leaks were identified at two of the pipelines.

181. On May 6, 2021, there was a pressure surge event resulting in the release of an estimated 1,600 gallons of jet fuel from supply piping in the lower access tunnel tanks during the refilling of another tank (Tank 20) on May 6, 2021 (**"May 2021 Fuel Leak"**). However, the May 2021 Fuel Leak was later determined to be significantly greater than initially estimated—from 1,600 gallons to over 19,000 gallons (an 11-fold increase).

182. On July 16, 2021, there was a fuel release from a pipeline at Kilo Pier of approximately 150 gallons (the 2021 **"Kilo Pier Fuel Leak"**).

183. On November 20, 2021, a release of at least 14,000 gallons of fuel and water mixture from the Fire Suppression System occurred at the Red Hill Fuel Facility (**"November 2021 Fuel Leak"**), and the source of this fuel leak was the May 2021 Fuel Leak.

184. These several fuel leaks are described in this Complaint as the **"Collective Fuel Leaks."**

185. Because the Fuel Tanks are located around 100 feet **above** the Oʻahu Aquifer, within a week of the November 2021 Fuel Leak, fuel flowed from the Red

64

Hill Shaft to the drinking water taps of one million residents, including those in military housing, causing a humanitarian and environmental emergency and disaster.

186.  The November 2021 Fuel Leak also caused the Hawaiʻi Department of Health to order the shutdown of the Red Hill Fuel Facility.

187.  To abate fuel leaks and ensure water and fire safety of the Red Hill Fuel Facility, the Military awarded the first Contract in 2015. Overall, the purpose of the Contracts was to perform the work to upgrade and maintain the Facility, including the Fire Suppression System, to prevent future leaks of fuel and foam into the Oʻahu Aquifer and to ensure the Facility was protected in the event of fire.

188.  More specifically, the Contractors were responsible to maintain critical components of the Red Hill Fuel Facility such as fuel pipes, Fire Suppressant Foam pipes, pressure pumps, motor controllers, alarm transmitters, heat sensors and the like, and to rebuild and maintain the entire Fire Suppression System. Subcontractors worked under the direction and oversight of the Contractors. Further, the Contractors were required to routinely apprise the Military of outstanding deficiencies and needed repairs of the Facility components, including the fuel piping and the Fire Suppression System.

189.  However, the Contractors knowingly violated the terms of their Contracts; these violations were material to the Contracts; and these material

65

violations contributed substantially to the Collective Fuel Leaks and rendered the
entire Facility a ticking time bomb.

## 1. Failure to Maintain the Defuel Pipeline

190. Contractors knowingly failed to maintain the "Defuel Pipeline" at the
Red Hill Fuel Facility between 2016 and 2021, in violation of the Contracts. These
collective and compounding failures led to the disastrous November 2021 Fuel
Leak, which caused substantial harm to the functional integrity of the Facility and
posed an imminent threat to human lives, the surrounding environment and
national security at Joint Base Pearl Harbor-Hickam.

191. The Defuel Pipeline is a dual-purpose pipeline that: (a) defuels Navy
Vessels from the Hotel Pier and (b) acts as a collection drain pipeline when the
thermal relief-pressure relief valves open and release excess fuel, gas and pressure
from the pipelines—known as the JP5, F76 and F24 Pipelines—coming and going
from the Hotel Pier. This critical function is intended to prevent an active pipeline
from bursting.

192. As early as 2016, critical pressure valves in the Defuel Pipeline have
failed testing. Yet on information and belief, during this time, the Contractors
failed to either (a) identify the Defuel Pipeline as inventory in need of inspection,
testing and maintenance, or (b) perform the necessary inspection, testing or
maintenance.

193. In response to the 2020 Hotel Pier Fuel Leak, the Military, Hawaiʻi and other regulatory agencies ordered the Contractors to excavate, test and inspect the Defuel Pipeline to determine the causes of the leak.

194. In early 2021, for the first time since at least 2016, a non-defendant subcontractor tested Defuel Pipeline pressure valves with these results:

- on January 23, 2021, an initial pressure test was inconclusive.
- on January 25, 2021, a second pressure test concluded that the Defuel Pipeline was leaking.

195. The Military concluded that fuel leaks were occurring because a portion of the Defuel Pipeline had degraded due to failed maintenance and repair and at least 3,000 gallons of fuel had to be removed from that line. That conclusion was confirmed after the May 2021 Fuel Leak by a report of the Defense Logistics Agency Energy (the "DLA Energy Spill Report").

196. Because of these leaks in the Defuel Pipeline, the Contractors sealed off the Defuel Pipeline from the rest of the Red Hill Fuel Facility to prevent leaking fuel from spreading throughout the Facility. The Pipeline, however, served a crucial function Facility-wide. The pressure relief valves in the Defuel Pipelines relieved excess pressure from other active fuel lines throughout the Facility. Because of this sealing of the Pipeline, which was necessary due to the

67

maintenance and repair failures of the Contractors, the Facility was rendered a
ticking time bomb—a disaster waiting to happen.

197. Sealing increased pressures on other active fuel lines, leading to
further potential Facility-wide eruption and fuel leaks beyond even the Defuel
Pipeline leaks.

198. The sealing was the Contractors' "fix" of their own failures to
maintain and repair the Defuel Pipeline that caused pressure on another JP-5 fuel
pipeline. And "the fix" itself appears to have led to two further leaks—the May
2021 Fuel Leak, which caused the November 2021 Fuel Leak (at least partly)—
creating a disastrous domino effect on the entire Red Hill Fuel System.

199. Further, the May 2021 Fuel Leak occurred after a pressure surge in
certain Facility-wide fuel lines, causing another JP-5 pipe to burst and release at
least 1,600 gallons of jet fuel, with the absence of the Defuel Pipeline to act as
pressure relief.

200. In turn, the Navy is investigating whether those releases from the May
2021 Fuel Leak entered the Red Hill Fuel Facility's lower access tunnel and
collected in the Fire Suppression System and whether the System then pumped the
fuel into the Retention Pipeline—a pipeline intended to collect and pump
wastewater (not fuel) to independent Underground Fuel Storage Tanks—leaving
standing fuel in the Retention Pipeline.

201.    On information and belief, at the time of the May 2021 Fuel Leak, the JP-5 Pipeline was stressed due pressure caused by the closed off Defuel Pipeline. This foreseeable and preventable stress caused by the Defuel Pipeline on this other Pipeline fell squarely on the Contractors who were responsible to maintain and repair the Pipeline as required under the Contracts.

202.    When the Military concluded that the May 2021 Fuel Leak was at least partly caused by the failures of the JP-5 line, it found several contributing factors, which confirmed Contractor failures to inspect, maintain and repair pipes, valves and alarms—basic but critical components of the entire Red Hill Fuel System.

203.    Yet none of the Contractors even detected this completely preventable series of related failures or potential damage, in violation of the Contracts and federal (EPA), state (Hawaiʻi) and Military requirements.

204.    Through their fraudulent course of conduct, the Contractors knowingly submitted or caused to be submitted false or fraudulent claims for payment under the Military Contracts, in violation of the False Claims Act, and the Military paid those claims.

205.    Because the Contractors falsely certified compliance with federal (including EPA), state (Hawaiʻi) and contractual requirements, they are jointly and severally liable under the False Claims Act.

## 2. Failure to Maintain the Fire Suppression System

206. Contractors also knowingly failed to maintain the Fire Suppression System at the Red Hill Fuel Facility, in violation of the Contracts. These collective and compounding failures led to the disastrous November 2021 Fuel Leak, which caused substantial harm to the functional integrity of the Facility and posed an imminent threat to human lives, the surrounding environment and national security at Joint Base Pearl Harbor-Hickam.

207. Because of further noncompliance with the Contracts, Retention Tanks of the Fire Suppression System that should have been capable of containing the May 2021 Fuel Leak, were rendered useless by the Contractors.

208. In response to the May 2021 Fuel Leak, the Military flushed the fuel collected in the lower access tunnels at the Red Hill "Book End" with the expectation that the excess fuel and water mixture would be captured in Retention Tanks of the Fire Suppression System, which were designed, instead, to contain any residual Fire Suppressant Foam.

209. Yet Contractors failed to assess and detect:

- the thousands of gallons of standing fuel in the Retention Pipeline of the Fire Suppression System—a pipeline that was intended to retain Fire Suppressant Foam, not a mixture of fuel and water.

70

- the fuel had entered the environment (i.e., the ground and

  Oʻahu Aquifer)

210.  That excess fuel and water mixture flooded the already overwhelmed

Fire Suppression System's line to the Retention Tanks, which contained standing

fuel, leading to the May 2021 Fuel Leak into the Tunnel and potentially the Oʻahu

Aquifer although it remains unknown whether the standing fuel and water mixture

in the Fire Suppression System leaked into the ground and the Oʻahu Aquifer

between the time of the May 2021 and November 2021 Fuel Leaks.

211.  Once again, this calamitous domino effect can be traced directly to the

failures of the Contractors to take all necessary steps for maintenance and repair of

the entire Facility and for a proper rebuild of the Fire Suppression System.

212.  For example, even if the pump of the Fire Suppression System had

been triggered (inadvertently or otherwise), there would have been no fuel to leak

into the Tunnel and no cracks for that fuel to leak through to the Oʻahu Aquifer but

for the pervasive and compounding failures of the Contractors over a several year

period of time.

213.  The November 2021 Fuel Leak was made catastrophic, not because of

unanticipated consequences, but instead because the Contractors knowingly failed

to inspect and detect the fuel overflow standing in the Retention Pipeline **for**

71

**months** after the May 2021 Fuel Leak and failed to maintain and repair known cracks in the lower access Tunnels of the Red Hill "Book End" **for years**.

214. Yet none of the Contractors even detected this completely preventable series of failures or potential damage, in violation of their obligations under the Contracts.

215. Through their fraudulent course of conduct, the Contractors knowingly submitted or caused to be submitted false or fraudulent claims for payment under the Military Contracts, in violation of the False Claims Act, and the Military paid those claims.

216. Because the Contractors falsely certified compliance with federal (including EPA), state (Hawai'i) and contractual requirements, they are jointly and severally liable under the False Claims Act.

### 3. Failure to Mitigate

217. Contractors also knowingly failed to mitigate the fuel leaks at the Red Hill Fuel Facility at least as early as 2018, in violation of the Contracts. These collective and compounding failures led to the disastrous November 2021 Fuel Leak, which caused substantial harm to the functional integrity of the Facility and posed an imminent threat to human lives, the surrounding environment and national security at Joint Base Pearl Harbor-Hickam.

72

218. The Military, the EPA, the Hawaiʻi Department of Health and other regulatory agencies were heavily reliant on the Contractors to provide them critical environmental information about the Red Hill Fuel Facility at least as early as 2018 to mitigate the damage that has ensued since that time. For example, since 2017, AECOM has received over $170 million to provide comprehensive long-term environmental action for the Naval Facilities Engineering Systems Command in the Pacific ("CLEAN V Contract").

219. In fact, AECOM prepared the reports that are required under the "CLEAN V Contract, Consent Order" to be submitted to the EPA and the Hawaiʻi Department of Health for their review and approval, and upon which the Military relies to inform its own long-term planning of the Red Hill Fuel Facility.

220. The Military and other Hawaiʻi and federal agencies such as EPA were misled and lulled by numerous false representations of the Contractors that there was little to no risk of contamination to the Oʻahu Aquifer from a fuel release. For example:

- "Taken together, the environmental data and the system-of-
  systems [focusing on release prevention, release detection, and
  release mitigation] demonstrate that **the drinking water is
  currently protected and will remain protected**."

73

- In the event of a "[l]arger continued chronic release[] or a large
  sudden release," there could be a "**localized** impact to the
  groundwater beneath the tanks," suggesting there would be no
  impact to drinking water supply wells.  (On information and
  belief, both the May 2021 Fuel Leak and the November 2021
  Fuel Leak were large releases).

- "[T]he [Groundwater F]low [M]odels alone indicate that there
  would **very likely be enough time to implement a water
  treatment system** at other wells such as Halawa Shaft, **if
  needed**."

- "Updated holding capacity calculations performed for
  hypothetical future release scenarios [presented in Contractors'
  report] found that **a sudden future release of approximately
  120,000 gallons of LNAPL (larger than any known
  historical release) would have, at most, a minimal impact to
  groundwater and would not likely cause an exceedance of
  risk-based decision criteria in Red Hill Shaft."**

(emphasis added)

221.    The flawed analyses and conclusions of the Contractors have been
condemned by Hawai'i and federal agencies.

74

222.    The Hawaiʻi Department of Health has expressed numerous serious

concerns about the misleading nature of the Contractors' representations such as:

- making "a set of assertions" about the data, without fully

   explaining how those assertions were reached or addressing

   data contrary to the assertions

- proposing a Red Hill Fuel Facility Conceptual Site Model while

   ignoring the Department's requests for additional

   documentation to support the proposed Model

- proposing a flawed Red Hill Fuel Facility Groundwater Flow

   Model: "[i]t has been repeatedly pointed out that, for that flow

   model to be supported, there needs to be an observable

   groundwater gradient in that same direction, but the model

   presented by AECOM remains little changed from that

   developed . . . for the 2007 Red Hill investigation that suffered

   from the same weakness."

- continuing to push their original interpretation of the

   groundwater flow directions, despite the Department's repeated

   questions and requests for additional supporting documentation

- Allowing an unprepared and unqualified individual to make the

   initial presentation to the Department of their seismic survey

> work findings: "[t]he individual presenting the results on behalf
> of AECOM was not the subcontractor who collected the data
> and was clearly not qualified to answer our questions regarding:
> how those interpretations were arrived at; any uncertainties in
> the depiction of the results; or AECOM's plans to further
> validate the interpretation presented." (emphasis in original)

223.    According to the Hawaiʻi Department of Health, the Collective Fuel
Leaks may have resulted in even further contamination of the Oʻahu Aquifer.
These Collective Fuel Leaks are directly attributable to the collective and
compounding failures of the Contractors to maintain the Defuel Pipeline and the
Fire Suppression System.

224.    In February of 2018, an environmental and water-resource consultant
of EPA and the Hawaiʻi Department of Health notified the agencies that the Red
Hill Fuel Facility Conceptual Site Model prepared by the Contractors "appears
over-simplified in its present form and appears to omit site-specific features and
processes that are likely to play an important role in evaluating the risk posed by
Red Hill fuel storage to potential receptors including Halawa and Red Hill shafts."

225.    The Contractors knowingly failed to prevent and mitigate each
respective Fuel Leak, creating the disastrous chain of events, when they had
knowingly:

- provided the Military with a flawed Red Hill Fuel Facility
  Groundwater Flow Model and Conceptual Site Model, which
  presented a misleading representation of the Red Hill Fuel
  Facility and its surrounding environment

- failed to perform proper soil vapor monitoring and testing

- on information and belief, knowingly failed to quantify the
  amounts or scope of fuel leaked during the May 2021 Fuel Leak

- knowingly failed to perform a proper root cause analysis after
  the May 2021 Fuel Leak

These failures hindered the ability of the Military, the EPA, the Hawaiʻi
Department of Health and other regulatory agencies to take effective actions in
response to each fuel leak.

226. The Contractors were well aware of their fundamental obligations to
evaluate and determine the nature and extent of the 2020 Hotel Pier Fuel Leak.

227. After the May 2021 Fuel Leak, the Military continued to raise
concerns about the likelihood of more fuel leaks and the importance of a full
investigation of the most recent leak: "If the root cause is not identified before the
JP5 line is repacked, there very well may be possibility that the line can over
pressurize again. I understand the need to get a tank back online and operational,
however, there is a chance of degrading the system again."

77

228.    And the Military was largely dependent on the Contractors to identify the cause and scope of the May 2021 Fuel Leak, as well as maintain the Defuel Pipeline and the Fire Suppression System.

229.    The Military relied heavily on Contractors with expertise and capability beyond the Military to determine the root causes of the May 2021 Fuel Leak (and earlier leaks) to prevent future leaks: "The Navy is investigating the duration, cause, and nature of the release and, at this time, is unable to respond to the specific concerns . . . The Navy has contracted a third party to conduct a thorough investigation into the release and root cause analyses."

230.    Immediately after the May 2021 Fuel Leak, the Military deployed AECOM to perform a "Root Cause Analysis" to isolate the Defuel Pipeline, determine whether the leaked fuel had been recovered and test for environmental contamination.

231.    In short, Contractors were retained by the Military to provide scientific, evidence-based and technical support when fuel leaks occurred to prevent, minimize and determine root causes of fuel leaks to avoid the precise kind of leak that occurred in May 2021, which then led to the preventable but disastrous November 2021 Fuel Leak.

232.    The November 2021 Fuel Leak was the culmination of pervasive failures of the Contractors who were put on notice as early as 2015 of the potential

for this precise type of fuel leak disaster, which Contractors were well-equipped
and well-funded with taxpayer money to mitigate.

233.    Further, the Contractors were retained by the Military to provide
urgent evaluation and response to the environmental hazards created by fuel leaks,
including groundwater and soil vapor monitoring and testing to prevent fuel leaks
such as the ones that occurred in November 2021.

234.    The Military's concern of soil leaks because of the proximity of the
Oʻahu Aquifer, prompted the immediate funding obligation for such efforts within
days of the May 2021 Fuel Leak.  The Military was heavily dependent on Group 1
Contractors to prevent and mitigate these significant problems.

235.    These Collective Fuel Leaks led to the Military and the Honolulu
Board of Water Supply shutting down several drinking water well stations that
serviced over one million people because water samples from the Red Hill Shaft
had fuel levels that exceeded the Hawaiʻi Department of Health's environmental
action level for drinking water by 66 to 350 times.

236.    On information and belief, to accurately assess whether and the extent
to which leaked fuel would enter the environment (the ground and the Oʻahu
Aquifer), the Contractors were required to (a) quantify the fuel that was released
after the May 2021 Fuel Leak and (b) identify the location(s) to determine the
scope of fuel leaks.

79

237.  These were fundamental contractual obligations that required the

Contractors to maintain and review inventory logs and photos of the material

components of the Red Hill Fuel System and review the site of the fuel releases.

Because they violated the Contracts, on information and belief, the Contractors

failed to accurately assess that the amount of fuel released in the May 2021 Fuel

Leak was significantly greater than initially estimated—from 1,600 gallons to over

19,000 gallons (an 11-fold increase), leading to the disastrous November 2021 Fuel

Leak.

238.  The knowing failure to assess the volume and scope of the May 2021

Fuel Leak was aggravated by the knowing failure of the Contractors to anticipate

future fuel leaks and their potential harm to the environment, in violation of the

requirement to complete a proper Groundwater Flow Model.  As a result of this

compilation of failures, the Military, EPA, the Hawai'i Department of Health and

other government agencies were wholly unprepared for the resulting environmental

harm, their remediation efforts were hindered, and the full extent of the

contamination from the Collective Fuel Leaks is still unknown.

239.  In short, none of the Contractors mitigated the potential damage, in

violation of their contractual obligations.

240.  Through their fraudulent course of conduct, the Contractors

knowingly submitted or caused to be submitted false or fraudulent claims for

80

payment under the Military Contracts, in violation of the False Claims Act, and the Military paid those claims.

241.   Because the Contractors falsely certified compliance with federal (including EPA), state (Hawai'i) and contractual requirements, they are jointly and severally liable under the False Claims Act.

**B. Red Hill Is a Ticking Time Bomb Because of Contractor Failures**

242.   In addition to their responsibilities to prevent, mitigate and remediate fuel leaks, the Contractors were also responsible to upgrade, maintain and repair the Fire Suppression System at the Red Hill Fuel Facility.  They were also responsible to ensure the safe operation of the entire Facility, including every single component part of the Facility—from fuel valves to foam pipes to fuel tanks to fuel lines.

243.   The Contractors failed to inventory critical components necessary to keep the Facility operating much less maintain them—parts that keep the System safe and operating.  Further, their failures with respect to the Fire Suppression System also contributed to the environmental catastrophe that harmed the water supply of one million Civilian and Military families and continues to threaten lives, the surrounding environment and national security at Joint Base Pearl Harbor-Hickam.

81

244.  The Contractors also knowingly installed fire suppressant foam pipes that were not fire resistant and failed to remove fire suppressant foam that was a known health hazard.

245.  In the hands of the Contractors, the entire Red Hill Fuel Facility has become and remains a ticking time bomb.  It is a water and safety hazard waiting to happen—unprotected even from small fires which can't be contained and further water contamination.

246.  Through their fraudulent course of conduct, the Contractors knowingly submitted or caused to be submitted false or fraudulent claims for payment under the Military Contracts, in violation of the False Claims Act, and the Military paid those claims.

247.  Because the Contractors falsely certified compliance with federal (including EPA), state (Hawai'i) and contractual requirements, they are jointly and severally liable under the False Claims Act.

**1. Failure to Remove the Bad Foam from the Fire Suppression System**

248.  The Contractors knowingly failed to properly rebuild, maintain and repair the Fire Suppression System to address known health hazards, in violation of the Contracts.  These collective and compounding failures contributed to the disastrous November 2021 Fuel Leak, which caused substantial harm to the functional integrity of the Facility and posed an imminent threat to human lives,

82

the surrounding environment and national security at Joint Base Pearl Harbor-

Hickam.

249.    The Pearl Harbor-Red Hill Fuel Facility houses 20 massive

Underground Fuel Storage Tanks that stores 250 million gallons of diesel and jet

fuels for the U.S. Military, U.S. Coast Guard, and other Governmental ships and

planes.  Naturally, warehousing this massive amount of fuel requires a Fire

Suppression System to protect both the Facility and human life in case of a fire

("Pearl Harbor-Red Hill Fire Suppression System" or "Red Hill Fire Suppression

System" or "Fire Suppression System" or FSS).

250.    A fire suppression system is engineered to:

- detect fires through heat, smoke, and other warning signs, and

- extinguish fires through use of a firefighting foam substance

251.    The Red Hill Fire Suppression System works to extinguish fires

through two features:

- automatic water sprinklers

- fire extinguisher foam, known as "Aqueous Film Forming

  Foam" or AFFF or "Fire Suppressant Foam"

252.    Water alone is not effective in fighting a fuel fire.  It must be paired

with Fire Suppressant Foam.

83

253.    Due to the enormous size of the entire Red Hill Fuel Facility—with
29 miles of pipelines and 7 miles of tunnels—the Fire Suppression System
contains Fire Suppressant Foam Tanks at both ends of the Facility—one at a
location called "Red Hill" and one at the opposite location called "ADIT 1."   Red
Hill and ADIT 1 represent the "Book Ends" of the Fire Suppression System, which
acts as a safety net for the entire Pearl Harbor-Red Hill Fuel Facility:

- Red Hill Fire Suppressant Foam Tanks protect the Red Hill
  Storage Facility

- ADIT 1 Fire Suppressant Foam Tanks protect the
  Underground Pump House and Upper Tank Farm.

The Appendix contains schematics for the upgrade of Fire Suppression System and
Ventilation System.

254.    The Fire Suppression System is considered critical infrastructure.
Accordingly, the Military required vigilant management by the Contractors to
ensure the Fire Suppression System was in working order, and the Contractors
were well-funded to support this important goal.

255.    The foam substance used in a fire suppression system to extinguish
fires has changed over time and the Military has been moving away from less
pollutant forms of foam.

84

256.    Historically, firefighting foam was manufactured from a group of chemicals called "per- and polyfluoroalkyl substances" because of their ability to repel water, grease and oil. "Such foams control fires by forming films which serve as barriers that effectively starve fires of oxygen."

257.    "Per- and polyfluoroalkyl substances"—a fluorinated pollutant—known as "PFAS" or "Forever Chemicals"—are the active ingredient in the Fire Suppressant Foam. When mixed with water and discharged, the foam forms an aqueous film that quickly cuts off the oxygen to a flame, extinguishes the fire, and stops the fire from relighting. The Appendix contains an image of what foam containing Forever Chemicals found on a beach looks like.

258.    The foam produced from these Forever Chemicals that is used to extinguish flammable liquid-based fires at fuel facilities like the Red Hill Fuel Facility is called Aqueous Film-Forming Foam ("AFFF").

259.    "AFFF based systems are presently installed and utilized at US Navy and US Marine Corps bases and installations throughout the world."

260.    In more recent years, the EPA has determined that Forever Chemicals may have harmful health impacts because they never break down, remaining present in people, animals and the environment over time; therefore, certain types of Forever Chemicals have been phased out of Fire Suppressant Foam when used in Fire Suppression Systems:

85

[EPA] is working "aggressively" to develop regulations
around a concerning group of chemicals, known as
**"forever chemicals," because they don't break down
natnrally in the environment**...[] the EPA is taking
major steps toward its action plan to address the so-called
"forever chemicals" announced earlier this year through a
proposal released Monday and more moves in the coming
weeks. The group of chemicals, technically known as
PFAS, are used in a variety of products ranging from
nonstick and waterproofing products to military-grade
firefighting foam. Some types of the chemicals have been
linked to health problems such as kidney disease or some
kinds of cancer.

(emphasis added)

261. Forever Chemicals are considered a pollutant or contaminant whose
longer-term effects continue to be studied.

262. Between 2016 and 2020, the Military issued at least three directives to
reduce the negative environmental and health effects of Fire Suppressant Foam.
These are referred to in the Complaint as the 2016, 2018 and 2020 "Foam

86

Replacement Directives." The Contractors were required to comply with these

Directives.

263. Under the 2016 Foam Replacement Directive, Contractors were

required to:

- **Immediately cease the uncontrolled environmental release of AFFF [Fire Suppressant Foam]** for shoreside installations . . . Installations should verify and ensure that [they] have appropriate controls in place to prevent an environmental release.

- **Update** and implement Navy and Marine Corps **firefighting system requirements,** as needed, to ensure fire and emergency service vehicles and equipment at DON installations and facilities are **tested and certified in a manner that does not allow the release of AFFF to the environmen**t.

- By the end of FY2017, **remove and dispose of uninstalled PFOS-containing AFFF** in drums and cans from local stored supplies for shore installations and ships **to prevent future environmental releases.**

(emphasis added)

264.    Under the 2018 Foam Replacement Directive, applicable to U.S. Naval facilities world-wide, the Contractors were required to flush, test and refill the Fire Suppression System with the Good Foam on an ASAP basis (the "2018 Foam Replacement Directive"), and specifically, to:

- "conduct testing of AFFF, as necessary, in installed [fire suppression] systems to determine removal and disposal requirements for product [and] identify and segregate all remaining uninstalled AFFF [Fire Suppressant Foam] not meeting the amended MILSPEC [Navy directive]" by the end of FY19.

- "remove, dispose, and replace installed and uninstalled AFFF that does not meet the maximum permissible limits."

265.    The Military had recognized that "if drinking water wells have been impacted, but do not have levels of PFOA and/or PFOS [the chemicals used in the Bad Foam] above the EPA LHA [lipohydroxy acid], then a site-specific decision needs to be made regarding continued monitoring until a long-term solution is implemented."

266.    Under the 2020 Foam Replacement Directive, there was a further recognition that any PFAS—Good or Bad Foam—may be harmful if leaked into water systems. The Military was working to "find an acceptable PFAS free

replacement for AFFF [Fire Suppressant Foam] that meets the lifesaving

performance requirements of current AFFF products."

267.   The Contractors were paid over $60 million to perform the follow

responsibilities:

- demolish and rebuild the Fire Suppression System and Ventilation
  System
- remove, dispose of and replace the Bad Foam in compliance with
  the Foam Replacement Directives
- maintain and repair the Fire Suppression System
- maintain the pipes that carry the Fire Suppressant Foam
- routinely inspect the Fire Suppression System
- provide quarterly and annual maintenance of the Fire Suppression
  System
- "immediately" report to the Military any "[s]ystem impairments
  and deficiencies"
- clean up operational failures

268.   The requirements for Fire Suppressant Foam removal, disposal and

replacement were specific:

- "removing and disposing of all Unacceptable AFFF [Fire
  Suppressant Foam] [containing the Bad Foam] concentrate . . . .

- [r]esulting systems shall be replenished as specified with Acceptable AFFF, reconnections made, and checked for leaks."

- **"identify** any necessary repairs (e.g., **existing leaks**, etc.) that should be made to facilitate the accomplishment of project objectives, namely, **the successful replacement of Unacceptable AFFF [the Bad Foam] with Acceptable AFFF [the Good Foam]**. The Contractor shall identify all such necessary repairs and request authorization from the Contracting Officer or COR to proceed prior to conducting the repairs."

(emphasis added)

269. However, the Contractors knowingly failed to eliminate the Bad Foam from the Fire Suppression System in violation of the Contracts, which caused substantial harm to the functional integrity of the System. Their failure to rid the System of the Bad Foam caused a harmful chain of events.

270. As part of the rebuild of the Fire Suppression System, the Contractors were required to flush the Bad Foam, refill the System with Good Foam, and test and certify that the Fire Suppressant Foam used in the System was compliant under the Contracts.

90

271.   By the time of the rebuild completion in 2019, the Bad Foam was required to be flushed and tested, and the Fire Suppression System refilled with the Good Foam under the Contract.

272.   Yet the Military was concerned that Contractors had not followed through on these commitments to flush the Bad Foam, test the replacement Foam and refill the System.

273.   The Military recognized that the failure to remove the Bad Foam from the Fire Suppression System was a serious safety vulnerability.

274.   Because of the knowing failures of the Contractors to properly eliminate the Bad Foam from the Fire Suppression System, the Military had to expend even more money.

275.   In January 2021, the Fire Suppressant Foam sample testing came back showing that all seven tanks had contamination levels too high to allow for the lower cost disposal alternative, resulting in the issuance of another contract award for nearly another $1 million to correct Contractor failures.

276.   Not confident that the Contractors had properly tested or removed the Bad Foam by the end of the rebuild, the Military issued an urgent contract modification and allocated more money for the Contractors to perform work on the entire System—from one Book End to the other—work that should not have been necessary in the first place, but which should have been completed.

91

277. Thus, the Military paid the Contractors twice for the same work to flush (rinse), test and confirm the removal of the Bad Foam and replace the Good Foam. Yet the Contractors failed to meet these mandatory requirements even though they knew the Military considered the Foam Replacement Directives material to the performance of their Contracts.

278. In December 2020, a non-defendant contractor tested the Fire Suppressant Foam and concluded that the dangerous PFAS chemical was more than allowable.

279. In fact, serious incidents involving the Fire Suppression System demonstrated that the Contractors never properly eliminated the Bad Foam from the System. Further, their collective and compounding failures led to a chain of events, causing further harm, damage and costs to the Military.

280. From at least 2019 to the present, the Contractors knowingly failed to inspect, test and maintain pipes that were later found to have leaked Fire Suppressant Foam.

281.    In one example, Fire Suppressant Foam was released from an over-pressurized pipe caused by a failed pump controller at one of the Book Ends (ADIT 1). This occurred in December 2019, at around the same time that the upgrade to the Fire Suppression System should have been completed.

282.   The Contractors were expressly required to properly remove any Bad
Foam that had been released and make the Fire Suppression System fully
operational:

> "Discharged solution shall be contained and disposed of in
> a manner that is acceptable to local authorities and as
> identified on the approved test plan. . . . system shall be
> returned to fully operational status, including filling of
> AFFF [Fire Suppressant Foam] concentrate tanks with
> concentrate and filling of solution piping with premix as
> required."

283.   It wasn't until after the Military hired another contractor in December
2020 to test the spilled Fire Suppressant Foam that it uncovered remnants of the
Bad Foam in one Book End (ADIT 1) because of botched work by the Contractor.

284.   This was more evidence that Contractors had knowingly failed to
ensure that the Bad Foam had been flushed from the Fire Suppression System
despite the significant amount of money the Military paid to the Contractors for the
upgrade, maintenance and repairs.

285.   As another example, in August 2020, the Military discovered Fire
Suppressant Foam that had leaked into a secondary containment pipe in ADIT 6.

286.   The Military was required to fund more contract work to remediate a leak of Bad Foam that should have been avoided by the original rebuild of the System and the routine maintenance and repairs of the Contractors.

287.   Because the Contractors never completed the removal of the Bad Foam, continuing leaks prevented the refill of the Good Foam, leaving the Fire Suppression System without firefighting foam.

288.   For at least a four-year period after the upgrade was required to be completed—the entire Red Hill Fuel Facility had either no or substantially diminished firefighting capability, jeopardizing lives, the surrounding environment and national security.  Without a working Fire Suppression System, Red Hill was and still is a ticking time bomb.

289.   Because of the non-compliant work of the Contractors, even routine maintenance failures caused substantial harm to the functional integrity of the Fire Suppression System and could have been catastrophic.

290.   For example, on September 29, 2020, a degraded (incandescent) light bulb in the Underground Pump House at one of the Book Ends (ADIT 1) triggered a heat sensor.  The heat sensor activated the Fire Suppression System, causing a massive flood and a release of residual Fire Suppressant Foam:

291.    Five thousand gallons of water containing the Bad Foam ("PFAS contaminated water") flooded the Underground Pumphouse at ADIT 1 because of a defective lightbulb.  The Appendix contains an image of this flood.

292.    Contractors were also required to **test** all components of the rebuilt Fire Suppression System to ensure that everything was operable for this critical infrastructure.

293.    The required testing included routine hydrostatic testing of the underground and aboveground piping systems to ensure that there was no leakage of Fire Suppressant Foam.  Hydrostatic tests apply pressure in the System's pipes and components to evaluate the pump's integrity and detect any leaks or weaknesses.

294.    Checking for leaks was especially significant because, as noted by the Replacement Foam Directives, even the Good Foam can be harmful if leaked into water systems.

295.    Accordingly, it was deemed essential that all systems that house Fire Suppressant Foam "minimize foam releases from fixed systems as a result of accidental discharges by using approved detection/control systems and proper maintenance of the system [and] [p]lan system testing so as to properly contain and dispose of foam solution . . . ."

296.  Further, Contractors were required to report any deficiencies
uncovered by these tests to the Military and promptly remediate.

297.  However, on information and belief, Contractors failed to perform any
of the required testing. No testing was performed to determine whether the System
was free of the Bad Foam, whether there were any Foam leaks, or whether the
System was overall in working order.

298.  From at least as early as 2015, the automatic Fire Suppression System
at the Facility has been non-functional—even after one Book End (ADIT 1) was
finally "flushed" of the Bad Foam in February 2021 –six years after the original
Contract award.

299.  In short, the Contractors failed to properly remove and replace the
Bad Foam during the rebuild, maintenance or repair of the Fire Suppression
System, in violation of their contractual obligations.

300.  Through their fraudulent course of conduct, the Contractors
knowingly submitted or caused to be submitted false or fraudulent claims for
payment under the Military Contracts, in violation of the False Claims Act, and the
Military paid those claims.

301.  Because the Contractors falsely certified compliance with federal
(including EPA), state and contractual requirements, they are jointly and severally
liable under the False Claims Act.

## 2. Failure to Install and Maintain Critical Components in the Fire Suppression System

302.    The Contractors also knowingly failed to comply with Contract requirements for the proper installation and upkeep of the most basic but critical components in the Fire Suppression System—leaving the entire Facility a ticking time bomb.

303.    As a single example, the Contracts explicitly required the use of steel piping and related steel components throughout the System because steel piping can handle high degrees of burning, i.e., 200+ degrees Celsius. The requirement for the installation of steel piping in the Fire Suppression System was a material term of the Contracts.

304.    Yet the Contractors knowingly ignored this requirement and installed a plastic synthetic piping (PVC piping) on certain pipelines instead of steel piping in the Fire Suppression System. PVC piping can only handle 60 degrees Celsius rather than 200+ degrees Celsius, a significant problem when the plastic pipes run alongside the fire-hot fuel pipes. The Appendix contains a photograph of the improper PVC piping in the Fire Suppression System, and two drawings showing the locations of the improper PVC piping.

305.    Because the PVC piping was used to transport Fire Suppressant Foam—the essential component to extinguish fuel fires and because of the close

97

proximity of the fuel pipes and the PVC pipes, a fuel fire would have likely melted

the PVC pipes, causing serious damage and a potential catastrophe in the event of a

fuel fire.

306.   Once the Military discovered the install of the wrong piping, the

upgrade to the Fire Suppression System was stalled, prompting an almost one third

increase in construction costs, and delaying by two years the expected completion

date—from 2017 to 2019.

307.   To correct this problem caused by the Contractors, a critical safety

feature had to be turned off within the Fire Suppression System, making the

System inoperable during repair work and posing an imminent threat to human

lives, the surrounding environment and national security at Joint Base Pearl

Harbor-Hickam.  For several reasons including this one, the failures of the

Contractors left the entire Facility a ticking time bomb.

308.   There were additional failures in basic equipment needed to keep the

Fire Suppression System in working order such as failure with:

- the jockey pump or pressure maintenance pump, which maintains
  the pressure in the fire sprinkler system to avoid non-emergency
  starting of the main fire pump and keeps the main fire pump from
  short cycling, which shortens its life span

- the motor controller, which controls some or all electric motors to include a combination starter—i.e., a motor starter, fuses or circuit breaker, and power disconnect

309. As further examples, the Contractors were required to test all components of the rebuilt Fire Suppression System to ensure that everything was operable. If tests reveal deficiencies—especially ones that related to or affected the fire alarm system—the Contractor was required to disclose these failures to the Military and remediate.

310. Contractors, however, knowingly failed to follow through on these contractual obligations, as well. Critical components of the Fire Suppression System were non-functioning when the Contractor installed them and remained inoperable for years such as the alarm transmitters and heat sensors.

311. The alarm transmitters (Kingfisher alarms) were intended to first notify the Regional Dispatch Center (RDC) at Joint Base Pearl Harbor-Hickam of a fire, followed by a notification to the Federal Fire Service. However, they had never been tested or monitored to determine if they were functioning. In fact, the Kingfisher alarms repeatedly malfunctioned and prompted false alarms.

312. The Military repeatedly notified the Contractors about these false alarms, particularly due to faulty Kingfisher alarm transmitters, which began almost immediately after the completion of the Fire Suppression System upgrade.

313.   One Contractor responsible for maintenance also acknowledged that the failed Kingfisher alarms should have been replaced for safety reasons.

314.   On information and belief, these false alarms were caused by collective and compounding failures of the Contractors who installed faulty equipment at the beginning of their Contracts, followed by the failure to maintain, repair and report these failures to the Military.

315.   The heat sensors throughout the Fire Suppression System also routinely malfunctioned and prompted false alarms.  False alarms were often tripped because of moisture on the sensors.  In one example, on June 20, 2020, a faulty heat sensor triggered a false alarm in the Facility.

316.   The Military expressed concern that the equipment failures led to the Fire Suppression System's default to **manual operation**.

317.   Conducting a root cause analysis, one Contractor found water in and surrounding the faulty device, which appeared to reflect an improper installation by Contractors in the first instance.

318.   Further, the Fire Suppressant Foam Pump House in one of the Book Ends (ADIT 1) malfunctioned, also causing false fire alarms and improper discharges of the Bad Foam, and forcing the System to shift from **automatic** mode to **manual** mode in 2021 —a dangerous shift over for a fire suppression system. In other words, the System would no longer react to a fire with automatic

100

sprinklers and fire suppressant foam. Instead, it required human intervention to activate these functions.

319. This pervasive and systemic failures left the entire Red Hill Fuel Facility a ticking time bomb, particularly in the event of an unattended fire.

320. For obvious safety reasons, a fuel facility like the massive Red Hill Fuel Facility—with 29 miles of pipelines, 7 miles of tunnels, 20 underground Fuel Storage Tanks—must have and maintain an automatic fire suppression system. The difference between an automatic fire suppression system and a manual one could be the difference between minor damage and total catastrophic loss in the face of a fuel fire.

321. Through their fraudulent course of conduct, the Contractors knowingly submitted or caused to be submitted false or fraudulent claims for payment under the Military Contracts, in violation of the False Claims Act, and the Military paid those claims.

322. Because the Contractors falsely certified compliance with federal (including EPA), state and contractual requirements, they are jointly and severally liable under the False Claims Act.

## 3. Failure to Install and Maintain Critical Components Throughout the Red Hill Fuel Facility

323. Beyond even the Fire Suppression System, the Contractors failed to maintain and repair components and infrastructure critical to the entire Red Hill Fuel Facility. These failures were pervasive and widespread, leaving the Facility a ticking time bomb.

324. Other malfunctioning components included oil pressure doors, which in the event of a catastrophic release of fuel, would not close and would prevent the fuel from flowing into the public waterways and the rest of the Red Hill Fuel Facility.

325. Yet the Contractors were paid to replace, maintain, and repair these oil pressure doors to prevent catastrophic fuel leaks. Properly functioning oil tight doors are necessary to trigger the Fire Suppression System to protect the Facility and surrounding community.

326. Basic failures in violation of the Contracts included:

- failure to prepare and share with the Military an updated inventory of equipment—the most basic first step to develop a maintenance schedule and plan

- failure to develop a recurring maintenance schedule or Facility Maintenance Plan to "ensure [the facilities'] availability to receive, store, distribute and dispense fuel."

- failure to "provide all required Recurring Maintenance and Minor Repairs Services identified through a Preventive Maintenance Plan"

327.   The Contractors failed to account for equipment at Pearl Harbor-Hickman and the Red Hill Fuel Facility. Both the significance and sheer volume of unmaintained equipment is deeply alarming and include:

- the serious failures with the Defuel Pipeline discussed in this Complaint

- all equipment at the Fuel Piers (except for one pier) where fuel is dispensed to Navy ships

- critical components at K-Bay, including Flightline Pits known as "hot pits," which allow for rapid aircraft refueling and re-launch

- thousands of valves, including over 100 crucial pressure and thermal relief valves, which regulate pressure and allow fuel to move safely through the system

- pressure gauges—and by example, there are at least 19 pressure gauges in the Red Hill Lower Tunnel alone

- all but 5 gate valves—and there are 5 gate valves on the Red Hill Fuel Storage Tank No. 16 alone

328.   Over 110 critical pressure and thermal relief valves at Pearl Harbor

Defense Fuel Support Point that the Contractor failed to maintain, in violation of

UFC 3-460-03, were identified.

329.   Yet the Contractor was aware that these valves were over 20 years old

and should have been replaced because they were no longer effective at sealing.

330.   As another example, hot pits were not included on the Contractor's

inventory of critical components and the Contractor failed to perform the required

quarterly and annual maintenance on them:

| NAVY PHASE 6 (KAN) MCB Hawaii (Kaneohe Bay) Main Base | | N61064-EA | |
|---|---|---|---|
| Item | Quantity | Notes | |
| Pumps | 3 | | |
| Gate Valves | 4 | 4" | |
| Ball Valves | 77 | 3/4" - 1" | |
| Aboveground Storage Tanks | 13 | | |
| Filter Separators | 2 | | |
| Service Station Dispensers | 4 | | |
| Fueling / Defueling Control Valve (302AF) | 4 | | |
| Non-Surge/Check Valve (81F) | 1 | | |
| Flow Meters | 7 | 300 - 600 gpm / 4" | |
| Strainers | 1 | | |
| Pressure Gauges | 70 | 1/2" | |
| Pressure Relief Valves | 43 | 3/4" Ball Valve | |
| Shear Valves | 4 | | |
| Hoses | 6 | | |

331.   In fact, the combined equipment inventory for the Red Hill Fuel

Facility and four other facilities accounted for only 89 items despite the enormous

magnitude of the Facility, which in fact contains thousands of components

requiring routine maintenance and repairs:

104

| NAVY PHASE 6 (RHL, EWA, WNH, WWH, MAK) | | N62813-RH, N62813-EW, N62813-WN, N62813-WW, N61064-FA |
| --- | --- | --- |
| **Item** | **Quantity** | **Notes** |
| Gate Valves | 5 | 4" |
| Ball Valves | 10 | 3/4" - 1" |
| Aboveground Storage Tanks | 9 | |
| Disconnect Switches | 2 | |
| Service Station Dispensers | 16 | |
| Tank Vacuum and Pressure Vents | 2 | |
| Liquid Level Gauges and Low-Level Controls | 9 | |
| High-Level Control Valves and Alarms | 9 | |
| Tank Gauges | 9 | |
| Vapor Recovery System | 2 | |
| Shear Valves | 16 | |

332.    In short, the Contractor failed to account for inventory at the Red Hill
Fuel Facility, a material violation of its Contracts. That first step caused a chain of
events and led to the complete derogation of its responsibilities to maintain and
repair critical components under the Contracts.

333.    These failures also included:

- the failure to perform quarterly and semi-annual maintenance of
valves associated with hot pit refueling systems

- the failure to perform semi-annual maintenance of the Hot Pit
Refueling Systems

- the failure to annually test the pressure relief and thermal relief
valves—described by the UFC as "absolutely essential" to a
fuel system

334.   Contractors routinely failed to comply with their quarterly maintenance requirements.

335.   On information and belief, the Contractors also failed to conduct any meaningful quarterly, semi-annual, and annual inspections of the Red Hill Fuel Facility.

336.   Because the Contractors' failures were pervasive and systemwide, they placed the Red Hill Fuel System at serious risk, jeopardizing human lives, the surrounding environment and national security.

337.   Through their fraudulent course of conduct, the Contractors knowingly submitted or caused to be submitted false or fraudulent claims for payment under the Military Contracts, in violation of the False Claims Act, and the Military paid those claims.

338.   Because the Contractors falsely certified compliance with federal (including EPA), state (Hawai'i) and contractual requirements, they are jointly and severally liable under the False Claims Act.

## V.   MATERIALITY

339.   Defendants knew that compliance with the Contracts was material to the Military's decision to pay claims for work under those Contracts.  Defendants also knew that truthful records and statements in support of claims for payments under the Contracts were material to the Military's decision to pay these claims.

106

340. Further, Defendants knew that compliance with the terms of the Contracts and with federal and state requirements was material to the Military's decision to pay claims. Defendants also knew that truthful records and statements in support of certifications of compliance were material to the Military's decisions to pay these claims.

341. Some of the factors in evaluating materiality under the False Claims Act include (a) statutory, regulatory, and contractual language, (b) whether the violations go to the heart of the benefit of the bargain, (c) whether the violations were serious and material and not merely technical or minor infractions of rules, (d) the Government's actions relative to similar violations, (e) whether any reasonable person would attach importance to Defendants' choice of actions, and (f) Defendants' knowledge relative to these factors. All these factors demonstrate materiality in this case and have been addressed throughout this Complaint.

342. Defendants knowingly submitted or caused to be submitted thousands of false or fraudulent claims and used false records and statements in support of false or fraudulent claims for payments under the Contracts.

343. Defendants did so in violation of the Contracts and federal (including EPA) and state (Hawai'i) requirements designed to protect against the potential and actual harms at the Pearl Harbor-Red Hill Fuel Facility, jeopardizing lives, the surrounding environment and national security.

344. The United States Department of Justice has enforced the False Claims Act in other instances of similar knowing failures to comply with material terms of U.S. Military Contracts as shown by the below examples.

345. One U.S. Marine Corps contractor paid $50 million, for duping the Military with regard to inflated prices for a suspension system for armored vehicles known as Mine-Resistant Ambush Protected vehicles: "This settlement agreement is another example of our commitment of ensuring that all military contractors comply with the law," said one Military official.

https://www.justice.gov/opa/pr/navistar-defense-agrees-pay-50-million-resolve-false-claims-act-allegations-involving (2021)

346. A subsidiary of a construction machinery company and a leading supplier of high-yield steel for naval submarines, paid over $10 million to resolve False Claims Act allegations that it produced and sold substandard steel components for installation on U.S. Navy submarines. The United States alleged that the government contractor produced castings that failed lab tests and did not meet the Navy's standards, and that its Director of Metallurgy falsified test results to hide the failures. https://www.justice.gov/opa/pr/bradken-inc-pays-108-million-resolve-false-claims-act-allegations-involving-substandard-naval (2020)

347. A defense contractor agreed to pay $27 million to resolve False Claims Act allegations that a company associated with it falsely represented

108

construction progress on a warehouse to induce the U.S. Defense Logistics Agency
to award the prime vendor contract to provide food to U.S. troops in Afghanistan.
https://www.justice.gov/opa/pr/defense-contractor-agrees-pay-45-million-resolve-
criminal-obstruction-charges-and-civil-false (2019)

348. A U.S. Military supplier agreed to pay more than $4.5 million to
resolve False Claims Act allegations that it knowingly sold substandard valve
components to U.S. Military shipbuilders, in violation of military specifications
and requirements. As the then-Acting Assistant Attorney General stated,
"Requirements like the Mil Spec [Military Specifications] and QPL [Qualified
Products List] play an important role in protecting the quality of the equipment
received by the government, as well as the safety of military
personnel. . . . Companies that knowingly fail to comply with these requirements
will be held accountable." https://www.justice.gov/opa/pr/crane-company-agrees-
pay-more-45-million-resolve-false-claims-act-lawsuit-non-compliance (2021)

349. A U.S. Military contractor agreed to pay $3.9 million to resolve False
Claims Act allegations that it sold substandard concrete for the construction of
U.S. Navy airfields, in violation of contract specifications. The United States
alleged the contractor's non-compliant concrete could impair the long-term
durability of the facility because it had a greater potential to deteriorate over time,
undermining the important U.S. Military interests at stake.

109

https://www.justice.gov/opa/pr/concrete-contractor-agrees-settle-false-claims-act-allegations-39-million (2021)

350. A defense contractor agreed to pay $11 million to resolve False Claims Act allegations that it provided electrical components to the U.S. Military that it had not properly tested. The United States alleged that, first, the defense contractor failed to conduct the required periodic testing of the electrical components. Then, after it began testing and recognized deficiencies in the components, the contractor failed to immediately disclose these deficiencies to the Government. https://www.justice.gov/opa/pr/itt-cannon-pay-11-million-settle-false-claims-allegations-untested-electrical-connectors;

https://www.justice.gov/usao-cdca/pr/itt-cannon-pay-11-million-settle-false-claims-act-allegations-it-sold-untested (2019)

351. Another U.S. Military contractor and its subsidiary also agreed to pay $11 million to resolve False Claims Act allegations that they knowingly failed to maintain nine helicopters in accordance with contract requirements and, because of this failure to maintain the helicopters, falsely certified the helicopters were "fully mission capable" when they were not. The then-Acting Assistant Attorney General stated, "The knowing failure to comply with contractual obligations [by failing to perform critical maintenance on department of Defense equipment] is unacceptable, particularly when such violations raise safety concerns." This

110

settlement "reaffirms that the government will hold contractors to the quality and

safety standards in their contracts that are intended to protect our men and women

in uniform." https://www.justice.gov/opa/pr/aar-corp-agrees-pay-11-million-settle-

false-claims-act-allegations-aircraft-maintenance (2021)

352.   Another U.S. Military contractor agreed to pay $6.58 million to

resolve False Claims Act allegations that it knowingly manufactured external fuel

tanks that failed to comply with contract specifications, and it failed to conduct

proper testing to ensure the equipment met quality standards. The United States

further alleged that the contractor falsely represented to another contractor that it

had performed a complete inspection of a component used in Military helicopters

and that those components conformed to contract specifications. The U.S. Attorney

noted these alleged failures to ensure that equipment and components met contract

specifications could have put Military servicemembers at risk.

https://www.justice.gov/opa/pr/general-electric-aviation-systems-pay-us-658-

million-resolve-false-claims-act-allegations (2013)

353.   These cases demonstrate that Defendants' same or similar conduct

alleged in this Complaint was material to the Government's decision to pay claims.

354.   The facts alleged in the Complaint show that Defendants were aware

of the contractual and federal and state requirements, which were clearly and

unambiguously incorporated into the Contracts.

111

355. Further, the Contracts themselves demonstrate that the U.S. Military

places considerable emphasis on compliance with the terms of their agreements

and the requirements incorporated into the Contracts. Because the Navy "spends

over $1 billion in annual obligations to meet global requirements for facility

operations and maintenance," the Navy supports these principles:

- "The first principle is that the **Navy views its contractors as
  partners** and not just abstract service providers. . . . [P]artners'
  success drives the Navy's successful mission completion."

- "The second principle is that the Navy will receive **insightful
  management from its contractors**. This management will include
  the knowledge, skills, authority and willingness to use contractor
  resources to find better ways of serving Navy clients' strategic and
  operational goals and objectives."

- "The third principle is that the Navy will adopt **industry best
  commercial practices** and maintain state-of-the-art service
  delivery. It is the Navy's and contractor's responsibility as partners
  to reach this goal. To that end, the Navy's emphasis will be in
  evaluating performance objectives (end results)."

356. Defendants' performance objectives and its ability to work as the

Military's partner at the Red Hill Fuel Facility, to utilize its knowledge and skill,

112

and to abide by industry best practices requires compliance with contractual provisions and the federal, state (Hawai'i), and Military standards incorporated into the Contracts. Defendants' failures to do so culminated in the "end results" that have come to pass: multiple fuel leaks that have already occurred, the inability to effectively mitigate the environmental harm, including catastrophic damage to the O'ahu Aquifer, and the imminent potential that more leaks could occur in the near future.

357. Defendants also knew that the unlawful conduct alleged in this Complaint went to the heart of the bargain of the Government's payment of claims under the Contracts.

358. The Contractors agreed to perform construction, maintenance, and evaluation work that was intended to avoid the precise catastrophe that has occurred and future potential catastrophes. Instead, the Contractors significantly contributed to these disasters by failing to ensure the essential components and systems were operating properly; obscuring their contract noncompliance from the U.S. Military; and providing a false sense of security about the systems and the environment that have since undermined the U.S. Military's and the regulating federal and state (Hawai'i) agencies' abilities to prevent and respond to the leaks. The violations of the Contractors went to the heart of the U.S. Military's payment

of claims to construct, maintain and evaluate the Pearl Harbor-Red Hill Fuel
Facility and to mitigate potential harms at the Facility.

359.   The Contractors agreed to install, maintain, and repair the Facility,
including the Fire Suppression System, to facilitate its durability and safety. The
Military retained Contractors to rebuild the Fire Suppression System precisely
**because** the previous System was inadequate, but the Contractors installed an
untested system that was inoperable, putting the Facility and U.S. Military men and
women at serious risk.  Contractor failures to comply with specified requirements
exacerbated the risks and potential harm to the System. The violations of the
Contractors went to the heart of the U.S. Military's payment of claims to install,
maintain, and evaluate systems that are essential to Military operations and safety.

360.   The contract specifications were not minor and insubstantial technical
requirements. These requirements are necessary to protect lives, the surrounding
environment and national security.

361.   Defendants' violations of the contractual and federal and state
(Hawai'i) requirements were serious and material, leading to actual or potential
harm, and were made with at least reckless disregard of the seriousness of their
violations.

362.   Defendants' violations were not immaterial or inadvertent technical
mistakes in the daily performance of their Contracts, or honest misunderstandings

114

of the terms and requirements of their Contracts. Rather, Defendants' violations

were sustained, material, and directly contrary to the very purpose of their

contractual duties.

363.    In short, there is ample evidence to show that Defendants knew, for

purposes of the False Claims Act, that their violations had the natural tendency to

influence the Government's decision to pay the claims under the Contracts and that

any reasonable person would attach importance to Defendants' choices of action.

## VI.    COUNTS

### COUNT I

#### Federal False Claims Act:
#### 31 U.S.C. § 3729(a)(1)(A)

364.    The allegations in the preceding paragraphs are incorporated by

reference.

365.    Defendants knowingly presented or caused to be presented false or

fraudulent claims for payment or approval in violation of 31 U.S.C. §

3729(a)(1)(A).

366.    The United States paid for claims under the Contracts that otherwise

would not have been paid.

367.    Because of these false or fraudulent claims, Defendants are jointly and

severally liable to the United States for incurred damages resulting from such false

claims, trebled, plus civil penalties for each violation of the Act, and liable for all
other relief authorized by the statute.

368. As a result of Defendants' violations, the United States has suffered
damages in an amount to be determined at trial.

## COUNT II

### Federal False Claims Act:
### 31 U.S.C. § 3729(a)(1)(B)

369. The allegations in the preceding paragraphs are incorporated by
reference.

370. Defendants knowingly made, used or caused to be made or used, false
records or statements material to false or fraudulent claims, in violation of 31
U.S.C. § 3729 (a)(1)(B).

371. The United States paid for claims under the Contracts that otherwise
would not have been paid.

372. Because of these false or fraudulent claims, Defendants are jointly and
severally liable to the United States for incurred damages resulting from such false
claims, trebled, plus civil penalties for each violation of the Act, and liable for all
other relief authorized by the statute.

373. As a result of Defendants' violations, the United States has suffered
damages in an amount to be determined at trial.

## COUNT III

116

## Federal False Claims Act:
## 31 U.S.C. § 3729(a)(1)(C)

374. The allegations in the preceding paragraphs are incorporated by reference.

375. Defendants knowingly conspired to commit a violation of the False Claims Act, in violation of 31 U.S.C. § 3729 (a)(1)(C).

376. The United States paid for claims under the Contracts that otherwise would not have been allowed.

377. Because of these false or fraudulent claims, Defendants are jointly and severally liable to the United States for incurred damages resulting from such false claims, trebled, plus civil penalties for each violation of the Act, and liable for all other relief authorized by the statute.

378. As a result of Defendants' violations, the United States has suffered damages in an amount to be determined at trial.

## COUNT IV

## Federal False Claims Act:
## 31 U.S.C. § 3729(a)(1)(G)

379. The allegations in the preceding paragraphs are incorporated by reference.

380. Defendants knowingly made, used, or caused to be made or used, false records or statements material to an obligation to pay or transmit money or

117

property to the Government, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the Government, in violation of 31 U.S.C. § 3729 (a)(1)(G).

381.   The United States paid for claims under the Contracts that otherwise would not have been allowed.

382.   Because of these false or fraudulent claims, Defendants are jointly and severally liable to the United States for incurred damages resulting from such false claims, trebled, plus civil penalties for each violation of the Act, and liable for all other relief authorized by the statute.

383.   As a result of Defendants' violations, the United States has suffered damages in an amount to be determined at trial.

**WHEREFORE**, Relator, on behalf of Relator and the United States, prays:

(a)   That the Court enter judgment against Defendants in an amount equal to three times the amount of damages the United States has sustained because of Defendants' actions, plus a civil penalty of any amount within the applicable statutory ranges, for each violation;

(b)   That Relator be awarded an amount that the Court decides is reasonable for recovering the proceeds of the action, on behalf of the United States, which, pursuant to the False Claims Act, shall be at least 15 percent but not more than 25 percent of the proceeds of the

action or settlement of the claim if the Government intervenes and
proceeds with the action, and not less than 25 percent nor more than
30 percent of the proceeds of the action or settlement of the claim if
the Government does not intervene;

(c)   That judgment be entered against Defendants jointly and severally, in
the amounts to be determined at trial; and

(d)   That Relator be awarded all costs and expenses incurred, including
reasonable attorneys' fees; and

(e)   That the Court order such other relief as is appropriate.


Trial by jury is hereby requested.

Dated: July _____ 11 _____, 2022

Respectfully submitted,

**CARL M. VARADY**
Hawai'i Bar No. 4873
Pauahi Tower
1003 Bishop Street
Suite 1730
Honolulu, Hawai`i 96813
808-523-8447
808-523-8448 (fax)
carl@varadylaw.com

**RENÉE BROOKER**
(admitted *pro hac vice*)
D.C. Bar No. 430159
**EVA GUNASEKERA**
(admitted *pro hac vice*)
D.C. Bar No. 502542
**Tycko & Zavareei LLP**
1828 L Street NW
Suite 1000
Washington, DC 20036
(202) 417-3664
(202) 973-0950 (fax)
reneebrooker@tzlegal.com
eva@tzlegal.com

## VII.  APPENDIX

### A. Red Hill Fuel Facility



Aerial view of the "Book Ends" of the Red Hill Fuel Facility



Schematics of the "Book Ends" of the Red Hill Fuel Facility

121

## B. Underground Tunnels and Pipelines



A glimpse of the 7 miles of Tunnels at the underground Red Hill Fuel Facility



Fuel Pipelines within the Red Hill Lower Access Tunnel



Tunnel at the Red Hill Fuel Facility

## C. Underground Storage Tanks



Underground Fuel Storage Tank



Inside an empty Underground Fuel Storage Tank



Entrance to an Underground Fuel Storage Tank



View looking up the access gallery toward gauging chamber above Fuel Tank 19

## D. Fire Suppression System



Image of Forever Chemicals, i.e., the Bad Foam



Fire Suppressant Foam sprinkler system used in lower tunnel area





Components of the fire alarm and mass notification system that supervise the Fire Suppression System and Detection System in Adit 1 and the upper and lower tunnels



Pump room showing gauges and thermal sensors



Inside Adit 1 after release (flood) of Fire Suppressant Foam and water mixture



Inside Underground Pumphouse after release (flood) of Fire Suppressant Foam and water mixture

## E. Pier to Fuel Ships



Photo of Naval Supply Systems Command (NAVSUP) Fleet Logistics Center (FLC) Pearl Harbor pier to fuel ships



Photo of Naval Supply Systems Command (NAVSUP) Fleet Logistics Center
(FLC) Pearl Harbor pier to fuel ships

## F. Improper PVC Piping



The Fire Suppressant Foam piping that caused the November 2021 leak is plastic (PVC) piping instead of steel



Location of synthetic plastic (PVC) versus steel piping improperly installed in the
Fire Suppression System



Location of synthetic plastic (PVC) versus steel piping improperly installed in the
Fire Suppression System